

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 5, 2025

<u>**BY CM/ECF**</u>
The Honorable Collen McMahon
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

      **Re:**    *United States v. Tommy Lin,* **23 Cr. 572 (CM)**

Dear Judge McMahon:

      Defendant Tommy Lin is scheduled to be sentenced on June 12, 2025 after pleading guilty to participating in a conspiracy to convert records and property of the United States, in violation of 18 U.S.C. § 371. Between 2014 and 2019, the defendant was a Director of Community Affairs in the New York City Mayor's Office, and he also served at times as a Senior Advisor to the New York City Police Department's Asian Advisory Council. The defendant leveraged those titles and positions within city government to ingratiate himself to members of a bank fraud conspiracy in a variety of ways, including by providing personal identifying information to members of the conspiracy, offering to conduct law enforcement database checks on their behalf, and ultimately assisting members of the conspiracy in getting a disgruntled member of the conspiracy arrested and detained by immigration authorities. The Government respectfully submits that a sentence of at least 36 months' imprisonment is sufficient but not greater than necessary to satisfy the purposes of sentencing for this serious criminal conduct.

**I.  Offense Conduct**

      This case stems from an investigation by the FBI into a fraudulent scheme to steal more than $10 million from FDIC-insured banks and other financial institutions between 2018 and 2022. (PSR ¶ 8). The scheme proceeded as follows: *First*, members of the scheme recruited other people (frequently foreign nationals from China and Taiwan temporarily residing in the United States) to open bank accounts at various bank branches in the New York City metropolitan area and elsewhere. Control over those bank accounts was then given to members of the scheme. *Second*, members of the scheme arranged for funds to be deposited and transferred between bank accounts controlled by members of the scheme. Next, members of the scheme caused fraudulent reports to be filed with the banks claiming that the wire transfers were unauthorized. This prompted the banks to temporarily credit the accounts in the amount of the transferred funds, even though members of the scheme had in fact authorized the transfers and maintained control over the transferred funds all along. *Finally*, members of the scheme arranged for the credited funds to be quickly withdrawn as cash or converted into cryptocurrency and moved to foreign cryptocurrency

exchanges before the banks realized that the unauthorized-transfer reports were fraudulent. The leaders of the scheme were based in Taiwan, and proceeds were frequently converted into cryptocurrency to be easily transmitted back to the leaders of the scheme. Overseas bank accounts were also sometimes used to provide the initial seed funding into new bank accounts. The scheme caused more than $10 million in actual losses to nearly a dozen banks and financial institutions (PSR ¶¶ 8-9).

Between at least approximately 2019 and 2020, the defendant—who served as the Director of Constituent Services in the Community Affairs Unit for the New York City Mayor's Office and also served as a Senior Advisor to the New York City Police Department—participated in the bank fraud conspiracy by offering a variety of services to co-conspirators, including: (1) providing names and personal identifying information to other members of the conspiracy for potential accountholders that could be used in the bank fraud scheme; (2) offering to check the names of members of the conspiracy in law enforcement databases; and (3) accepting approximately $20,000 in cash in exchange for arranging for co-defendant Henry Yau—a Deportation Officer with U.S. Immigration and Customs Enforcement—to arrest a disgruntled accountholder who had previously participated in the scheme ("Victim-1"). As part of the process of getting Victim-1 arrested and detained, Yau accessed law enforcement databases and provided confidential government information about Victim-1 to the defendant, which was passed along to members of the bank fraud conspiracy. (PSR ¶¶ 10-11)

The PSR lays out a number of text messages that were exchanged between the defendant, Yau, and other members of the bank fraud conspiracy. The messages show, among other things, that:

- The defendant was introduced to members of the bank fraud conspiracy in or around November 2019 and bragged about his employment in the New York City Mayor's Office and the possibility that he could be in the White House in the future. He also claimed to hold a "title at the immigration office." (PSR ¶ 12).

- The defendant also provided to members of the conspiracy a screenshot of his NYPD business card, showing that he was a "Senior Advisor" within the NYPD's Asian Advisory Council. (PSR ¶ 13).

- The defendant provided photographs of a Canadian driver's license and social security card in or around January 2020, requesting $1,500 for each set of personal identifying information. Similarly, in or around March 2020, the defendant sent the names and dates of birth of two individuals to members of the conspiracy, requesting $6,000 as a "down payment" for these two individuals to serve as accountholders. (PSR ¶¶ 13-15).

- The defendant offered to check the names of members of the conspiracy in law enforcement databases in or around April 2020 after members of the conspiracy were concerned that NYPD law enforcement officers were conducting surveillance on them, agreeing to pay the defendant $500 for the law enforcement database checks. In or around June 2020, the defendant told members of the conspiracy that he had conducted the checks and that none of them were under investigation. (PSR ¶¶ 18-19).

- In or around June 2020, the defendant and members of the conspiracy began discussing a plan for arranging for the arrest of Victim-1, noting on multiple occasions that the defendant "can arrest anyone with no papers here."  On or about October 28, 2020, the defendant told members of the conspiracy that Victim-1 had been arrested and sent photographs of Victim-1 sitting in an ICE holding cell to members of the conspiracy.  The defendant stated to members of the conspiracy: "That's why they shouldn't bully Brother Tommy's friends."  Immediately after that message, the defendant asked to get together with members of the conspiracy either the next day or the following day—almost certainly to be paid for the arrest.  (PSR ¶¶ 22).

The defendant's cellphone also contained text messages between the defendant and Henry Yau showing that he had previously asked Yau to check law enforcement databases on prior occasions, including an instance in August 2019 when the defendant sent a screenshot of a Delaware driver's license to Yau and asked: "Can you guys detain someone in Delaware?"  (PSR ¶ 23).  Similarly, the defendant asked Yau in September 2019 to check and see if a "friend of mine" had passed his or her citizenship interview.  (PSR ¶ 24).

The defendant was interviewed by law enforcement on November 22, 2023 at JFK Airport, and he made several false statements to law enforcement.  For example, the defendant denied providing assistance to the bank fraud conspiracy or receiving any money from them.  (PSR ¶ 25).

## II. Procedural History and Guidelines Range

The defendant was arrested on June 6, 2024, after a grand jury returned an indictment charging the defendant with participating in a bank fraud conspiracy, in violation of 18 U.S.C. § 1349; wire fraud conspiracy, in violation of 18 U.S.C. § 1349; and aggravated identity theft, in violation of 18 U.S.C. §§ 1028A and 2.

On March 14, 2025, the defendant pleaded guilty pursuant to a plea agreement to participating in a conspiracy to convert government records, in violation of 18 U.S.C. § 371.  (PSR ¶¶ 1-3).  Pursuant to U.S.S.G. § 1B1.2(c), the parties stipulated that the defendant participated in a bank fraud conspiracy, in violation of 18 U.S.C. § 371.  Pursuant to U.S.S.G. § 3D1.2(d), the parties stipulated that the conspiracy to convert government records and bank fraud conspiracy were grouped together because the offense level is determined largely on the basis of the total amount of loss.  Pursuant to U.S.S.G. § 2B1.1(a)(2), the parties stipulated that the base offense level is 6.  Pursuant to U.S.S.G. § 2B1.1(b)(1)(C), the parties stipulated that a four-level enhancement applies because the gain to the defendant exceeded $15,000, and the precise amount of the loss could not reasonably be determined.  Pursuant to U.S.S.G. § 2B1.1(b)(10), the parties stipulated that a two-level enhancement applies because a substantial part of the fraudulent scheme was committed from outside the United States.  Pursuant to U.S.S.G. § 2B1.1(b)(11), the parties stipulated that a two-level enhancement applies because the offense involved the possession or use of any authentication features, including authentication features located on driver's licenses and social security cards.  Pursuant to U.S.S.G. § 3A1.3, the parties stipulated that a two-level enhancement applies because a victim was physically restrained during the course of the offense. Pursuant to U.S.S.G. § 4C1.1, the parties stipulated that a two-level decrease applies because the

defendant satisfies all the criteria set forth in U.S.S.G. § 4C1.1(a). Assuming a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, the plea agreement stipulated that the total offense level was 12. The plea agreement also stipulated that the defendant has zero criminal history points, resulting in a Criminal History Category of I. As a result, the plea agreement stipulated that the applicable Guidelines range was 10 to 16 months' imprisonment. (PSR ¶ 3).

The PSR calculated a total offense level of 11 and a Criminal History Category of I, resulting in a Guidelines range of 8 to 14 months' imprisonment. (PSR ¶¶ 40-52, 55, 92). Unlike the plea agreement, the PSR applied the two-level decrease under U.S.S.G. § 4C1.1(a) after the reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. As a result, the PSR calculated that the defendant was eligible for the additional one-level decrease for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b). The Government agrees with the PSR's calculation of the Guidelines range.

## IV.    Discussion

### A.  Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. A Sentence of at Least 36 Months' Imprisonment is Necessary to Serve the Purposes of Sentencing

The Government respectfully submits that a sentence of at least 36 months' imprisonment is necessary in this case to reflect the seriousness of the defendant's conduct, provide just punishment for the offense, achieve specific and general deterrence, protect the community from further crimes by the defendant, and promote respect for the law.

At the outset, a substantial term of imprisonment is necessary to reflect the seriousness and extraordinary scope of the defendant's criminal activity. Between at least November 2019 and November 2020, the defendant participated in a multi-million-dollar bank fraud conspiracy by serving as the conspiracy's law enforcement insider, leveraging his titles and employment with the City of New York and the NYPD to develop corrupt relationships with members of the conspiracy. Among other things, the defendant offered to check law enforcement databases to see if members of the conspiracy were being investigated, provided personal identifying information to see if the conspiracy could exploit the identities to make money from bank fraud, and ultimately assisted in silencing a disgruntled member of the conspiracy by arranging for the arrest of that individual by immigration authorities.

There was no question that members of the conspiracy were using the defendant to evade law enforcement detection. They asked the defendant to provide advice about suspicious cars that appeared to be conducting law enforcement surveillance, and they agreed to pay the defendant $500 to conduct law enforcement database checks to ensure that they were not being investigated. Members of the conspiracy also made it very clear why they wanted the defendant's assistance in getting Victim-1 arrested by immigration authorities. In a message in June 2020, the defendant was told: "[Victim-1] used to be one of our customers . . . I am worried he may report us to the police. Is there *any way to keep his mouth shut and deport him directly*?" (emphasis added). In other words, the defendant was being asked to intimidate and silence a potential cooperating witness who might reveal the bank fraud conspiracy to law enforcement. When Victim-1 was successfully arrested by ICE and placed in immigration custody, the defendant gloated to his co-conspirators, saying: "That's why they shouldn't bully Brother Tommy's friends." The defendant's willingness to be paid a $20,000 bribe in exchange for using law enforcement resources to help criminal fraudsters obstruct a potential investigation is extremely serious conduct. By having someone like the defendant on their payroll, the defendant also emboldened members of the conspiracy to continue in their criminal conduct. One of the members of the conspiracy said this about having the defendant on their side: "I am a little bit emotional! It's like the real version of Project Gutenberg,[1] cops and criminals, same family!" Simply put, there can be no dispute that the defendant committed extremely serious crimes by participating in this bank fraud conspiracy for nearly a year.

In his sentencing submission, the defendant suggests that he was lying to his co-conspirators about his access to social security numbers, personal identifying information, and law enforcement databases. To be clear, the Government is aware of no evidence in the record supporting this self-serving claim. To the contrary, the text messages show that the defendant

---

[1] Project Gutenberg is a 2018 crime thriller film originally released in Hong Kong.

transmitted a Canadian driver's license and social security card to members of the conspiracy in January 2020 (PSR ¶ 13), and he sent two sets of names and dates of birth to members of the conspiracy in March 2020 (PSR ¶ 15). The Government also became aware through its search of the defendant's cellphone and witness interviews that the defendant regularly was referring individuals in need of immigration assistance, like the filing of asylum applications or permanent residency applications, to a particular lawyer ("Lawyer-1") in exchange for a fee from the individuals. Through this referral business, the defendant would have had access to the personal identifying information of individuals who do not yet have legal status here—precisely the kind of individuals that the conspiracy targeted. Similarly, the evidence shows that the defendant in fact had access to law enforcement databases through his relationship with ICE Deportation Officer Henry Yau, at a minimum. Separate and apart from his involvement in the bank fraud conspiracy, the defendant asked Yau for assistance in running names in immigration databases on multiple occasions in August 2019 and September 2019—before his participation in the bank fraud conspiracy even began. (PSR ¶¶ 23-24). While the defendant may have exaggerated his capabilities to some extent, the defendant's access to personal identifying information and law enforcement databases was not mere bluster.

The defendant's history and characteristics also support a significant term of imprisonment and, contrary to the defendant's arguments, do not warrant a downward variance. There are several aspects to the defendant's criminal activities in this case that are extremely concerning:

*First*, the defendant grew up in a supportive family, graduated from high school in New York City, and received some college credits before beginning a 20-year career in various roles for the City of New York. His siblings are law-abiding citizens who have worked as a nutritionist, an administrative assistant, and a kitchen aide. Unlike the many defendants who appear before this Court for sentencing who come from completely disadvantaged backgrounds, the defendant was given every opportunity to succeed, and he in fact succeeded. Prior to his arrest, the defendant was earning a significant annual salary at the New York City Department of Environmental Protection and had amassed numerous assets, including home ownership in Forest Hills. For all intents and purposes, the defendant appeared to be living a stable and comfortable life with his wife and children. Nevertheless, the defendant decided to join ranks with members of a bank fraud conspiracy who were seeking to use the defendant's connections to law enforcement as a means to further their own criminal goals.

The defendant speculates in his sentencing submission that he was lured or manipulated by members of the bank fraud conspiracy, and he participated in these crimes in part because of a lack of self-esteem based on his physical appearance, lifelong health issues, and lack of friends. Whether that is true or not, the evidence clearly shows that the defendant was also motivated by greed. Based on the text messages exchanged between the defendant and members of the conspiracy, the defendant bragged about his ability to assist the conspiracy and was asking for money in exchange for his assistance ("Brother Tommy is asking for $1500 for a set of stuff."). Immediately after bragging about how he was able to arrange for Victim-1's arrest, the defendant also contacted members of the conspiracy for his payment. ("Tommy is urging about money . . . Tommy is inviting me for dinner to get his money."). The defendant had numerous opportunities to disconnect himself from members of the conspiracy and he failed to do so. Instead, he eagerly

jumped at the opportunity to arrange for another individual to be arrested by ICE in exchange for a $20,000 bribe.

Finally, the Government stresses the need for the Court's sentence to provide both individual deterrence and general deterrence to the public. The Government's investigation of the defendant and his co-defendant Henry Yau has revealed that the potential for the misuse of government records and corruption within law enforcement is real. It is also largely hidden from view, as the rise of cellphone encryption technology has made investigating such crimes challenging, if not impossible in many circumstances. To impose a sentence of mere probation here would be viewed by possible offenders as an invitation to engage in these types of crimes with impunity, suggesting that the penalties for assisting fraudsters and other criminals will be light if an offender is ever caught. A sentence of mere probation would also suggest to the defendant that his crime was not serious, and the harm he caused by serving as a law enforcement insider for a multi-million-dollar bank fraud conspiracy was not serious. Given the scope of the conduct here and the defendant's abuse of his titles and roles in New York City government, the Government respectfully requests that the Court impose a sentence of at least 36 months' imprisonment.

The Government recognizes that this requested sentence is significantly above the Guidelines range of 8 to 14 months' imprisonment. However, the Government respectfully submits that the Guidelines range here fails to reflect, among other things, the length of time that the defendant participated in the conspiracy, his use of his positions and connections within city government to further the crime, and his willingness to arrange for the arrest of a potential witness against the conspiracy in an attempt to obstruct a potential law enforcement investigation. As the Court is well aware, the Guidelines range under U.S.S.G. § 2B1.1 also sometimes overly emphasizes the loss amount, and here, the Government does not have a means of reasonably estimating the loss amount that is attributable to the defendant, even though he was certainly aware that he was participating in a sophisticated bank fraud conspiracy. Moreover, a sentence of at least 36 months is in line with other sentences imposed for similar types of conduct. For example, in *United States v. Harris*, 24 Cr. 207 (LAK) (S.D.N.Y.), Judge Kaplan sentenced the defendant to 41 months for accepting $50,000 in bribes in exchange for awarding $500,000 in contract work. In *United States v. Figueroa*, 23 Cr. 161 (MAD) (S.D.N.Y.), the defendant was sentenced to 24 months' imprisonment for referring criminal defendants to an attorney in exchange for approximately $40,000 in bribes. Similarly, the defendant abused his and his co-defendant's position here over and over again to assist a criminal conspiracy to avoid law enforcement detection in exchange for monetary bribes.

For these reasons, the Government respectfully submits that an above-Guidelines sentence of at least 36 months' imprisonment here is warranted.

## IV.    Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of at least 36 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    _____/s/_____
Andrew K. Chan
James Ligtenberg
Ni Qian
Assistant United States Attorneys
(212) 637-1072 / 2665 / 2364

cc: Stephen Scaring, Esq.