**GRANGER & ASSOCIATES LLC**

RAYMOND R. GRANGER
HOWARD B. ZAKAI
KEITH O'DONNELL

40 FULTON STREET
17TH FLOOR
NEW YORK, NEW YORK 10038
——
TEL: (212) 732-7000
FAX: (212) 732-7001

OF COUNSEL:
EMILY C. GOLUB
——
MATTHEW D. JURY
MCCUE JURY & PARTNERS
LONDON, U.K.

November 6, 2026

The Honorable Colleen McMahon
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Re: *United States v. Henry Yau*, Docket No. S8 23 Cr. 572 (CM)

Dear Judge McMahon:

I write on behalf of Defendant Henry Yau with respect to his upcoming sentencing, which is scheduled for November 18, 2026. Pursuant to a plea agreement, Mr. Yau pled guilty to one count of conspiracy to receive and to accept bribes and gratuities in violation of 18 U.S.C. §§ 201(b)(2)(A), 201(b)(2)(C), and 201(c)(1)(B).

## I. THE CHARGES

On March 26, 2026, Mr. Yau pled guilty to one count of a superseding felony information, pursuant to a written plea agreement. The superseding information charges that from about 2015 through about 2024, Mr. Yau engaged in a conspiracy to receive and to accept bribes and gratuities in violation of 18 U.S.C. §§ 201(b)(2)(A), 201(b)(2) (C), and 201(c)(1)(B). It alleges that, in furtherance of the conspiracy, Mr. Yau checked confidential law enforcement and immigration databases at the request of a co-conspirator and that he received a series of benefits, including dinners and bottles of liquor, in exchange for providing that information

## II. MR. YAU'S BACKGROUND AND PERSONAL CIRCUMSTANCES

### A. Mr. Yau's Personal and Professional Background

Mr. Yau is the son of Chinese immigrants from the Guangdong province. He was born in Manhattan grew up in an apartment on the Lower East Side. Although Mr. Yau's childhood was stable and he enjoyed a close relationship with his parents, sister, and brother, life was difficult, particularly due to the family's financial struggles. Mr. Yau's father was the principal provider for the household and worked as a cook in local restaurants, a tailor at sewing shops, and a merchant at various times. His mother provided day care for the children of other Chinese families

in the neighborhood, and Mr. Yau would help her by putting milk in baby bottles and throwing away diapers. There were times when the family survived without heat or other basic necessities due to the inability to pay utility bills. These difficulties instilled in him at an early age the value and necessity of working hard, as well as the virtue of helping others in need. During college, Mr. Yau worked multiple jobs simultaneously to pay his way through school and to avoid having to take out loans. He graduated from St. John's University in 2006 with a Bachelor of Science degree. See Exhibit A at 002.

The attacks of September 11, 2001, weighed heavily on Mr. Yau and inspired him to serve both his country and community, and to be a part of something that was greater than himself. When he was seventeen years' old, he began serving as a poll worker. He initially volunteered as a translator and now serves as an inspector assisting with the administration of elections. After college, Mr. Yau applied for positions in law enforcement and the military, including the Coast Guard and the Army. He underwent the Armed Services Vocational Aptitude Battery (ASVAB), a timed, standardized multi-aptitude test utilized by the United States military, and attended the Military Entrance Processing Station (MEPS), a medical-evaluation and fitness-screening program. Shortly before Mr. Yau signed a contract to join the military, the Department of Homeland Security ("DHS") offered him a position and Mr. Yau began his career in law enforcement.

Mr. Yau first entered on duty with Immigrations and Customs Enforcement ("ICE") in June 2007 as an Immigration Enforcement Agent at the Enforcement Removal Operations' ("ERO") San Francisco Field Office. There he assisted the detainee docket and maintained more than 500 case files concerning final orders of removal or other immigration proceedings. Mr. Yau was reassigned to the ERO's New York Field Office in approximately 2008 and his position was eventually restructured as a Deportation Officer ("DO"). Over the course of nearly a decade, Mr. Yau was assigned to various units, including Transportation Removal Operations, Justice Prisoner Air Transportation Service ("JPATS"), and Non-Detained Alternatives to Detention ("ATD").

In 2016, Mr. Yau became a Course Developer and Instructor at the Federal Law Enforcement Training Center ("FLETC") - ERO/ICE Basic Academy in Brunswick, Georgia. He was a Lead Course Developer – Instructor of the Deportation Officer Training Program (Basic) and a Senior Instructor. After approximately a year, Mr. Yau returned to New York to work as a DO with the Fugitive Operations Unit.

In 2021, Mr. Yau became a Supervisory Detention and Deportation Officer ("SDDO") and managed the Transportation Removal Operations Unit at John F. Kennedy Airport. Mr. Yau was responsible for coordinating with Headquarters Air Operations and other field offices on commercial flights transiting through the airport by providing operational support on inbound and outbound flights, including high-profile cases requiring additional law-enforcement support to deter noncompliant passengers who could potentially jeopardize safety or garner media or other public attention. He organized operations for 190 verified-departure cases and 220 meet-and-greet cases without major incident or media attention. He also responded on an *ad hoc* basis to receive incoming minors who had recently crossed the border and to reunite them with their families and sponsors upon arrival. Mr. Yau also managed the Criminal Apprehension Program Unit in Manhattan.

Mr. Yau also assumed a number of collateral duties. In 2008, Mr. Yau became a member of ERO's Special Response Team ("SRT"). He ultimately came to lead large-scale operations to assist with recoveries from natural catastrophes, high-risk and high-profiled arrests, escorts, protection details, and other agency initiatives. In 2018, he volunteered to become one of 10 snipers for the SRT in connection with executing high-risk warrants. In addition, as a Field Intelligence Officer ("FIO") starting in 2017, Mr. Yau created and maintained the intelligence-report database, which allows all ERO field offices and their respective facilities to submit informative reports online. In this capacity, Mr. Yau was the FNY Intelligence Operations Unit 2018 recipient of the ICE Director's Protecting the Homeland Award. See Exhibit A at 001. In addition, Mr. Yau served four years as a Task Force Officer in the Counterterrorism and Criminal Exploitation Unit with DHS Homeland Security Investigations, which identified foreign nationals from special-interest countries who pose a threat to national security.

Mr. Yau's work performance throughout his career was consistently strong. As a DO, he received ratings of "Outstanding" and "Excellent," and earned performance-based cash awards each year as a result. As a SDDO, he earned ratings of "Excellent" and "Exceeds Expectations." In addition to earning multiple time-off awards in connection with his performance and receiving the COVID19 Special Act Award, Mr. Yau became a highly credentialed and skilled officer and instructor. His credentials and training include:

- ICE Advanced Supervisory Leadership Training 22-014V-Certified (9/2022)
- ICE Supervisory Leadership Training 22-001-Certified (9/2021)
- ICE Tactical Operations Unit-Tactical Observer - Police Sniper Course (TOPS-1801)- Certified (5/25/2018)
- FLETC Use of Force Instructor Training Program, UOFITP-704-Certified (3/24/2017)
- FLETC Basic Tactics Instructor Training Program, BTITP-701Certified (2/3/2017)
- FLETC Active Shooter Threat Instructor Training Program, ASTITP-703-Certified (12/9/2016)
- FLETC Basic Tactical Medical Training Program, BTMTP-606- Certified (9/15/2016)
- FLETC Instructor Techniques for Non-Lethal Training Ammunition, ITNTA-605- Certified (8/26/2016)
- FLETC Law Enforcement Control Tactics Instructor Training Program, LECTITP-605- Certified (8/12/2016)
- FLETC Law Enforcement Fitness Coordinator Training Program, LEFCTP-607-Certified (7/22/2016)
- ICE Instructor Development Course, IDC-615- Certified (9/23/2016)
- ICE/ERO Field Operations Training Program-Prosecutions Module (DFOTP-P) – Certified (11/2017)
- ICE Enforcement and Removal Operations Intelligence Collection Course (ERIC)-706- Certified (7/28/2017)
- ICE National Firearms and Tactical Training Unit Defensive Tactics Instructor Training Program – Certified (5/2011)

- ICE National Firearms and Tactical Training Unit Chemical Munitions and Specialty Impact Weapons Instructor Course – Certified (1/2010)
- ICE National Firearms and Tactical Training Unit Firearms Instructor Training Program – Certified (06/2009)
- ICE/ERO Fugitive Operations Training Program (FOTP) – Certified (12/2009)
- ICE National Firearms and Tactical Training Unit Special Response Team Basic Operator Course – Certified (8/2008)
- Office of Firearms & Tactical Program SRT Refresher (12/2014)

### B. Mr. Yau's Medical Conditions and Disability Retirement

Mr. Yau suffers from sudden sensorineural hearing loss and tinnitus, attributed to noise exposure on the firearms shooting range in the course of his-enforcement duties. See Exhibit B at 003, 007, 008. He suffers from total loss of hearing in his left ear, and tinnitus and sixty-percent hearing loss in his right ear. Despite receiving various forms of treatment, including steroidal injections in order to stimulate the nerves in his ears, as well as the prescription medication prednisone, his physicians have been unable to restore any of his hearing loss, which has been diagnosed as permanent. See Exhibit B at 005, 006. Mr. Yau's tinnitus is constant and interferes with his ability to concentrate and to maintain attention. Since August 2026, Mr. Yau has experienced recurrent episodes of vertigo and dizziness, which impair his balance, stability, concentration, and normal daily functioning. See Exhibit B at 008-009. Mr. Yau's doctor has advised that he undergo vestibular rehabilitation and biannual audiograms, obtain a rheumatology consultation, and adhere to a strict noise-protection protocol. See Exhibit B at 009.

Because of these conditions and his inability to continue working, Mr. Yau applied for federal disability retirement, which was approved in October 2024 on the grounds of left-ear sensorineural loss and tinnitus. See Exhibit C.

In addition, since July 2024, Mr. Yau has been under the care of Dr. Page Yin, a Board certified psychiatrist with City Psychiatry in Manhattan. After learning of the investigation in this case, Mr. Yau began to experience anxiety and depression, and he has since been diagnosed with anxiety, depression, and Post-Traumatic Stress Disorder (PTSD), for which he attends monthly individual counseling sessions. See Exhibit D. Around the time of his arrest in November 2024, he experienced suicidal ideation, though he has never attempted any self-harm. Mr. Yau also suffers from lower back pain and myalgia, for which he underwent a minor surgical procedure. He is under the care of a rheumatologist and a specialist in the field of neuromusculoskeletal medicine and osteopathic manipulation. See Exhibit B at 010, 011.

### C. Mr. Yau's Involvement in the Community

Mr. Yau has also been active in his community throughout life. As noted above, Mr. Yau has been serving as a poll worker since he was seventeen years' old, when he began volunteering as a translator, and now serves as an elections inspector. Mr. Yau has always viewed poll workers as essential to running elections due to their responsibilities, which include opening and closing the polls; checking voters in and issuing ballots; assisting voters as needed; implementing election laws and procedures; maintaining the chain of custody of ballots, voting equipment, and supplies;

closing the polls; and reconciling the number of voters checked in with the number of ballots cast. He proudly takes the oath given to poll workers to uphold election laws and to protect the security of the election.

Since childhood, Mr. Yau has been a member of the New Apostolic Church, attending services, helping with community cookouts each summer, and otherwise participating in its youth programs. Mr. Yau has also volunteered to teach children traditional "lion dancing" at his former martial-arts school.

### D. Mr. Yau is the Sole Caretaker of his Elderly and Infirm Mother

Mr. Yau currently resides in a one-bedroom apartment with his mother and adult brother (he is forty-two years' old). Mr. Yau's father died at the age of 90 in April 2025 of various medical conditions related to Parkinson's and Alzheimer's Diseases. Mr. Yau's mother is 80 and suffers from several health conditions, including osteoporosis, which has led to bone fractures and limited mobility; glaucoma; pulmonary issues; latent tuberculosis; cognitive decline; and memory loss. Mrs. Yau's primary neurologist has diagnosed her with dementia. Dementia assessments performed in June 2025 and June 2026 reported dementia-severity scores of 40/54 and 44/54, respectively, and daily-living-independence-index scores of 1/6 and 0/6, respectively. The neurologist has recommended additional home-care hours by the caregiver. See Exhibit E at 001.

Mr. Yau is his mother's sole caregiver. His brother is a hoarder and effectively dysfunctional, and unable to assist in caring for their mother. In Mr. Yau's words, his brother spends "every waking moment" in front of his computer or on his phone. Attached as Exhibit F are photographs of the apartment. Mr. Yau sleeps on the floor because there is no room for a bed. He would move his mother out but for the fact that she insists that she wants "to take care" her other son and worries what will become of him once she is gone. Mr. Yau is thus resigned to living in the conditions pictured.

Mr. Yau's sister resides in Rego Park and has young children of her own. Mr. Yau's brother is not able to provide consistent and adequate care for their mother.

Mrs. Yau writes that her son

> is someone I need to take care of me because I am 80 years old and need his assistance with many aspects of my daily life.
>
> I frequently need to use the bathroom and have difficulty walking and moving around. Every day, my son helps me prepare breakfast, lunch, and dinner. He also helps me shower and do my laundry.
>
> Whenever I go outside, my son holds on to me and supports me while I walk. Without my son's help, I cannot go anywhere by myself. I am at risk of falling, and I frequently feel dizzy. I need my son to accompany me whenever I go out because I have problems

> with my brain and sometimes don't remember things. I therefore rely on my son to help me with these matters.

See Exhibit G at 006.[1]

Mr. Yau's sister, Susanna Yau, has expressed particular concern for their mother and fears how Mr. Yau's potential absence from the home due to a term of imprisonment would negatively impact her already fragile and declining health. See Exhibit G at 001-003.

### E. Additional Letters of Support

The letters of support submitted by family and friends are a testament to Mr. Yau's good character, kindness, and devotion to others.

Mr. Yau's partner, Lily Lau, speaks warmly of Mr. Yau providing stability and emotional support for her and her teenaged daughters:

> Henry has become such an important and cherished part of my life and my family. Throughout our relationship, he has been my rock. During some of my most difficult moments, he has stood by my side and provided me with emotional support, encouragement, comfort, and stability. I have come to know him as someone who is caring, dependable, responsible, and genuinely compassionate. I am divorced and have two daughters, ages 17 and 15. Henry has embraced them with kindness, patience, and respect. He has never made them feel like they were separate from his life. Instead, he has built a meaningful relationship with both of them and has become someone they know they can trust and rely on. He has been a positive and important presence in their lives, and on numerous occasions, he has also supported our family financially when we needed help.

See Exhibit G at 005. Ms. Lau also expresses her admiration for how Mr. Yau cared for his father prior to his passing:

> To me, Henry has shown time and time again that family always comes first. One of the things that has touched me the most is seeing how caring and devoted he was to his father while his father was still alive. As a single mother, I understand how difficult it can be to care for another person every single day and to put someone else's needs before your own. However, the way Henry cared for his father, who had Parkinson's disease, was unlike anything I had ever seen before. I witnessed his patience, dedication, and the way he

---

[1] The translation was provided by a certified translator/interpreter; the original letter follows the translated version in the exhibit. See Exhibit G at 007.

> consistently attended to his father's everyday needs. It was not something he did only when it was convenient. He showed up day after day, with patience and love, even when I knew it could not have been easy. Seeing the level of care and commitment he gave to his father showed me the depth of his character and the kind of son and person he truly is.

Id.

Mr. Yau's sister, Susanna, offers multiple anecdotes of Mr. Yau's acts of kindness, generosity, and integrity. She writes, for example:

> Henry is also an exceptionally honest and fair person. I recall an incident many years ago when our father gave Henry a substantial amount of money from his savings. Henry immediately recognized that it would not be fair for him alone to receive such a gift. He spoke with our father and ensured the money was divided equally between us. He has always been someone who refuses to keep anything he believes does not rightfully belong to him.
>
> Another example occurred during a church outing when we were children. Henry found money in a park and immediately turned it over to our priest. Although the priest later returned the money to him, Henry chose not to keep it. Instead, he used it to buy ice cream for members of the church group. This act reflected the fairness, honesty, and integrity that have always been part of his character.

See Exhibit G at 001. Susanna also describes Mr. Yau as bringing "calm and stability to family situations," whether it be shouldering responsibility during difficult times, resolving family disputes, or supporting and guiding others. Id. at 002. She notes that "[o]ne of Henry's strongest qualities is his deep sense of responsibility, particularly toward our family," and speaks proudly of his assuming responsibility for caring for their parents. Id. at 001. She writes:

> Since our father's death, Henry has continued to show the same level of commitment in caring for our mother. Due to her advanced age, declining health, and memory issues, she relies heavily on him for her daily needs. When I ask my mother questions about her medical appointments or medications, she often tells me to ask Henry because he manages those aspects of her care. Henry has become an essential part of her daily life, and I fear she would be unable to live independently without his assistance.
>
> One particularly heartbreaking example occurred when I encouraged my mother to resume taking walks around Chinatown to help with her joint stiffness, something she once did regularly without hesitation. She responded that she would only go if Henry

> accompanied her. He has truly stepped into the role of a dependable caregiver and companion, always willing to be by her side and provide the support she needs.

Id.

Mr. Yau's mother's letter, handwritten in Chinese, is a raw testament to just how indispensable Mr. Yau is in her life. She concludes: "My son has a kind heart, is responsible, and is trustworthy. I truly need his care and assistance in my daily life." See Exhibit G at 006.

Dr. Vincent Wong, who has known Mr. Yau since elementary school, describes him as "a close and loyal friend," as "warm, personable and caring," particularly to people in need, and as "dependable [and] consistent, not just to me but also to his family and community." Dr. Wong also describes volunteering at hospitals and community clinics with Mr. Yau in high school and college, and admiring Mr. Yau's work ethic. See Exhibit G at 009. This included the Chinatown Health Clinic (currently known as the Charles B. Wang Community Health Center) and the Beekman Hospital (currently known as New York-Presbyterian Lower Manhattan Hospital).

Dr. Cynthia Tam, who treated Mr. Yau's father, notes how Mr. Yau "consistently demonstrated exceptional attentiveness, compassion, and patience" in assisting his father with his medical needs. See Exhibit E at 002. Reverend Andrew Miller, a former pastor at Mr. Yau's church, likewise speaks highly of Mr. Yau's devotion to his parents' care. See Exhibit G at 008.

Jun Lee, a friend since elementary school, speaks of Mr. Yau's kindness and generosity, noting, in one example, how he protected him from bullies in grade school. See Exhibit G at 010-011. He writes that "Henry is a good friend, a good sibling, a good uncle and most of all a good son to his parents." Id. at 011.[2]

## III. MR. YAU PROMPTLY ACCEPTED RESPONSIBILITY AND AGREED TO PLEAD GUILTY

Mr. Yau accepted responsibility promptly after his arrest. [redacted] reflect his genuine remorsefulness and desire to make amends.

The parties entered into a plea agreement on March 26, 2026. With respect to the Sentencing Guidelines, Mr. Yau has no criminal-history points and his Criminal History Category is I. The parties further stipulated to a total offense level of 19, which is predicated upon:

- a base offense level 14, U.S.S.G. § 2C1.1(a)(1);

[2] Mr. Yau has been shunned by his former law-enforcement colleagues, and even those with whom he was particularly close refused to provide letters of support, which is not an unusual phenomenon in the undersigned's experience.

- a two-level enhancement because the offense involved more than one bribe, U.S.S.G. § 2C1.1(b)(1);

- a two-level enhancement because the value of the payments obtained exceeded $6,500 and was less than $15,000, U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(B);

- a four-level enhancement because the offense involved a public official in a high-level decision-making and sensitive position, U.S.S.G. § 2C1.1(b)(3);

- a two-level enhancement because the defendant was a public official who facilitated entry into the United States for a person, U.S.S.G. § 2C1.1(b)(4);

- a two-level decrease because the defendant satisfies all the criteria set forth in U.S.S.G. § 4C1.1(a);

- a two-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1(a); and

- an additional one-level reduction pursuant to U.S.S.G. § 3E1.1(b).

See Plea Agreement at 2-3. Based upon a total offense level of 19 and a Criminal History Category of I, the parties stipulated to a Guidelines range of 30-37 months' imprisonment. Id. at 3. As per the PSR, the Probation Department agrees with the parties' calculations but recommends a below-Guidelines sentence of 20 months' imprisonment.

Mr. Yau agreed to forfeit $12,600 to the United States pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461(c). See Plea Agreement at 1-2.

Mr. Yau also agreed to make restitution to persons or entities other than the victim of charged conduct as follows: $15,000 to the Small Business Bureau; $10,000 to the New York State Emergency Rental Assistance Program; and $150,000 to New York State Medicaid Fraud Control Restitution Fund. See Plea Agreement at 2.

## IV. MR. YAU'S SENTENCE

In light of the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and its progeny, such as Rita v. United States, 551 U.S. 338 (2007), Gall v. United States, 552 U.S. 38 (2007), and Kimbrough v. United States, 552 U.S. 85 (2007), the basic framework for sentencing and the application of the advisory Sentencing Guidelines is well settled. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," Gall v. United States, 552 U.S. at 49 (citing Rita v. United States, 551 U.S. at 347-48), which is the "the starting point and the initial benchmark." Id. The district court then considers all of the § 3553(a) factors to determine whether they support the sentence requested by a party and without presuming that the Guidelines range is reasonable. Id. at 49-50.

Under 18 U.S.C. § 3553(a), the district court must undertake its overarching statutory charge to impose a sentence that, considering "the nature and circumstances of the offense and the history and characteristics of the defendant," is "sufficient, but not greater than necessary":

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a), 3553(a)(l), and 3553(a)(2). The court should also consider "the kinds of sentences available . . . any pertinent Sentencing Commission policy statement . . . the need to avoid unwarranted sentence disparities among similarly situated defendants . . . and, where applicable, the need to provide restitution to any victims of the offense." Id. § 3553(a)(3)-(7). "District courts must determine in each case what constitutes a sentence that is 'sufficient, but not greater than necessary,' 18 U.S.C. § 3553(a), to achieve the overarching sentencing purposes of 'retribution, deterrence, incapacitation, and rehabilitation.'" Rosales Mireles v. United States, 585 U.S. 129, 132-33 (2018)(citing Tapia v. United States, 564 U.S. 319, 325 (2011); 18 U.S.C. § 3551(a), 3553(a)(2)).

"[I]n the end, [the court] must make an 'individualized assessment' of the sentence warranted by § 3553(a) 'based on the facts presented.'" United States v. Jones, 531 F.3d 163, 170 (2d Cir. 2008)(quoting Gall v. United States, 552 U.S. at 50). Indeed, the Sentencing Guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom." United States v. Milikowsky, 65 F.3d 4, 9 (2d Cir. 1995). As the Supreme Court has noted,

> [i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

Concepcion v. United States, 597 U.S. 481, 482 (2022)(quoting Koon v. United States, 518 U.S. 81, 113 (1996)).[3]

Mr. Yau makes no excuses for his conduct, and he takes full responsibility for it. There are, however, compelling reasons for the Court to consider exercising its broad discretion by sentencing Mr. Yau to a below-Guidelines sentence under 18 U.S.C. § 3553(a).

---

[3] Although the parties agreed not to seek a departure or adjustment under the Guidelines not otherwise specified, they agreed that either party may seek a sentence outside of the stipulated Guidelines range based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a). See Plea Agreement at 3.

First, Mr. Yau is deeply remorseful, and has struggled with powerful feelings of embarrassment, humiliation, and failure. He has had much time to reflect on his actions, and he realizes the great harm they caused. Mr. Yau's treating psychiatrist, Dr. Yin, remarks:

> As our therapeutic relationship developed over time [] I observed a markedly different individual than the stoic former Immigration and Customs Enforcement officer he initially presented himself to be.
>
> Beneath that exterior was an emotionally vulnerable, deeply humble, and remarkably conscientious individual. Rather than attempting to portray himself as a victim or shifting responsibility onto others, Mr. Yau consistently accepted responsibility for his actions while simultaneously attempting to understand how he had exercised such poor judgment**.** Even when discussing individuals whose actions ultimately contributed to his legal circumstances, he remained hesitant to disparage or betray them, reflecting an unusually strong sense of personal loyalty that frequently extended beyond what was healthy for himself. Throughout treatment, I never observed attitudes suggestive of entitlement, arrogance, manipulation, or a lack of remorse. If anything, Mr. Yau demonstrated an excessive tendency toward self-blame, often holding himself responsible for events far beyond his control.

See Exhibit D at 2 (emphasis added).

Second, while Mr. Yau recognizes the seriousness and wrongfulness of his conduct, he never acted with malice or greed. Indeed, Dr. Yin provides extraordinary insight into how Mr. Yau's childhood and cultural background contributed to poor decision-making, as opposed to any desire to exploit:

> As I came to know Mr. Yau more fully, I also developed a greater understanding of the psychological and cultural factors that shaped his interpersonal functioning. Raised in the heart of New York City's Chinatown under financially difficult circumstances, he described a childhood characterized by government-subsidized housing, limited financial resources, parents who worked long hours to support the family, and an early assumption of adult responsibilities. These experiences fostered many admirable qualities, including humility, generosity, diligence, and an unwavering sense of filial responsibility. At the same time, they also contributed to longstanding personality traits characterized by an intense desire for approval, difficulty disappointing others, excessive loyalty, and a tendency to prioritize interpersonal harmony over asserting his own boundaries.

> Throughout treatment, it became increasingly apparent that these interpersonal vulnerabilities significantly influenced his decisionmaking throughout adulthood. Mr. Yau consistently described himself as someone who wished to help others, who found it difficult to refuse requests made by individuals he considered friends, and who often viewed relationships through a lens shaped by longstanding cultural values emphasizing reciprocity, generosity, and maintaining social harmony. While these factors do not excuse the conduct underlying his conviction, they provide important psychological context for understanding how an individual without antisocial traits or criminal motivations could nevertheless exercise profoundly impaired judgment. In my professional opinion, his conduct reflected interpersonal vulnerability and poor judgment rather than greed, exploitation, or malicious intent.

See Exhibit D at 2. Similarly, Mr. Yau's sister, Susanna, writes:

> I would also like to provide some cultural context regarding our upbringing as Chinese Americans. We were raised with strong values emphasizing generosity, reciprocity, and putting the needs of family and friends before our own. Our mother always taught us that when someone helps you or gives you something, you should reciprocate whenever possible. Examples include never arriving at a friend's or family member's home empty-handed and always returning hospitality with kindness and generosity. Certain actions may be misunderstood when viewed outside of this cultural context, and I respectfully ask that these values be considered when evaluating my brother's conduct.

See Exhibit G at 002.

Third, Mr. Yau's rehabilitation and growth since the beginning of these proceedings cannot be understated. Dr. Yin notes:

> Perhaps most importantly, I have observed substantial psychological growth throughout the course of treatment. The Henry Yau I first met is not the same individual I treat today. Initially, his thinking reflected a simplistic understanding of the events surrounding his case and was dominated by overwhelming shame and self-condemnation. Over time, he has demonstrated increasing insight into both his own vulnerabilities and the broader ethical responsibilities associated with his former position. He has become considerably more nuanced in his thinking, recognizing how excessive people-pleasing, blurred interpersonal boundaries, and an inability to say no created circumstances in which he became susceptible to manipulation and poor decision-making. Although

> these tendencies remain areas of ongoing therapeutic work, he now possesses significantly greater awareness of them than when treatment began.
>
> One of the clearest indicators of his rehabilitation has been the consistency of his remorse. Rather than diminishing over time, his remorse has deepened as he has continued to reflect upon the consequences of his actions for himself, his family, his former colleagues, and the public trust associated with his profession. This reflection has not appeared performative or motivated by the impending sentencing process. Instead, it has represented a genuine maturation in his understanding of personal responsibility and ethics.
>
> Outside the clinical setting, Mr. Yau has also reconstructed his sense of purpose. Following the passing of his father in 2025, for whom he had served as a primary caregiver, he assumed an even greater role in caring for his elderly mother. She now relies heavily upon him for her daily functioning, including transportation to medical appointments, medication management, grocery shopping, meal preparation, household responsibilities, and companionship. Throughout treatment, he has consistently spoken of these responsibilities not as burdens, but as meaningful obligations that provide direction and purpose in his life. He has also described developing an even closer relationship with his sister and her family, finding renewed meaning through these familial connections. Throughout my treatment of Mr. Yau, I have also observed countless examples of the values by which he attempts to live. He frequently spoke about helping elderly individuals navigate subway stations, assisting strangers carrying heavy belongings up and down the stairs, treating service workers with generosity and respect, and attempting to perform quiet acts of kindness without expectation of recognition. While these individual acts are not extraordinary in isolation, taken together they are consistent with the compassionate and service-oriented personality I have observed over the course of treatment.

See Exhibit D at 2.

Fourth, Mr. Yau's role as the sole caregiver for his mother also warrants consideration under 18 U.S.C. § 3553(a)(1). United States v. Dey, No. 07-CR-725JBW, 2009 WL 1730956, at *2 (E.D.N.Y. June 18, 2009)(in considering the "nature and circumstances of the offense and the history and characteristics of the defendant" under 18 U.S.C. § 3553(a)(1), court noted that while the offense was serious, the defendant was the primary caregiver for his children and demonstrated a good work history prior to his becoming disabled due to being hit by a car, and imposed a

sentence of five years' probation). As the letters from family and physicians reflect, Mr. Yau is clearly indispensable to his mother's wellbeing. Mr. Yau's sister writes:

> His absence would be deeply felt by both my mother and me because of the emotional and practical support he provides. He plays a vital role in our family, particularly in caring for our mother. I truly believe it would be devastating for her if he were no longer able to be present in her life. His absence would have a significant negative impact on our family, and I respectfully ask that he be given the opportunity to be a continued support for the family.

See Exhibit G at 002.

The letters from friends and family and Mr. Yau's pastor all resoundingly attest to Mr. Yau's good-hearted and generous nature. The fact that Mr. Yau suffers from various debilitating medical conditions and, as acknowledged by the PSR, that he is a first-time offender and served the public for more than seventeen years as a highly-skilled law-enforcement officer, are also strong mitigating factors.

As summarized by Dr. Yin:

> Based upon my longitudinal treatment of Mr. Yau, I believe he has undergone genuine psychological rehabilitation. He demonstrates meaningful insight into his conduct, sustained remorse, emotional maturity, and a sincere commitment to living according to the ethical standards he now understands more fully. In my professional opinion, he presents an exceptionally low risk of future criminal conduct. The profound psychological consequences of these proceedings, coupled with the substantial personal growth I have observed and his continued commitment to caring for his family, make future misconduct highly unlikely.

See Exhibit D at 3.

Mr. Yau is deeply impressionable in his dealings with others, particularly with those he looks up to or admires, even to the point of naïveté. Although Dr. Yin has noted Mr. Yau's significant progress in understanding the impact of these ingrained personality traits on his judgment and actions, it is respectfully submitted that when Mr. Yau worked for ICE he encountered a group of individuals that was essentially a den of thieves who sensed those traits and saw a mark who could be easily manipulated and groomed to further their illicit goals. That is not meant to suggest Mr. Yau is not responsible for his actions. But it is a significant factor in explaining how he finds himself before this Court for sentencing.

Mr. Yau respectfully submits that, given the totality of the circumstances, including that he is the sole caretaker for his mother and that, in the words of Dr. Yin, he presents an "exceptionally low risk of future criminal conduct," a downward variance to a Zone A or Zone B

guideline range is warranted. Should the Court agree, Mr. Yau respectfully submits that a sentence "sufficient, but not greater than necessary" to achieve the overarching sentencing purposes of 18 U.S.C. § 3553(a) would be probation or probation with a period of home detention in the case of a Zone A guideline range, or probation with a minimum term of imprisonment satisfied by a period of home detention in the case of a Zone B guideline range.[4]

Respectfully submitted,

Raymond R. Granger

cc: AUSA Andrew Chan
AUSA Ni Qian
AUSA James Ligtenberg
USPSO Meherun Meyer

[4] Application Note 9 to Guideline § 5C1.1 provides that, "If the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range is in Zone A or B of the Sentencing Table, a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3), is generally appropriate. *See* 28 U.S.C. § 994(j)."

# EXHIBIT A


Protecting the Homeland Award
for
Outstanding accomplishments
and valuable contributions to
the national security
of the United States.
HENRY YAU
DEPORTATION OFFICER
ERO NEW YORK INTELLIGENCE
OPERATIONS UNIT

002

# St. John's University

The Trustees of St. John's University, New York
on the recommendation of the Faculty of
The Lesley H. and William L. Collins College of Professional Studies
have conferred upon

## Henry Lopfun Yau

the degree of

## Bachelor of Science

together with all honors, rights and privileges pertaining thereto, in
recognition of the fulfillment of the requirements for this degree.
In Witness Whereof we have hereunto subscribed our names and
affixed the Seal of the University, at New York in the State of New York
this fourteenth day of May, two thousand and six.

Chairperson of the Board

SIGILLUM UNIVERSITATIS STI. JOANNIS NEO-EBORACI 1870

Brian J. Shanley, O.P.
President

Dean

# EXHIBIT B

**Henry Yau Medical Records**

**Documents Redacted in Entirety**

**Henry Yau Medical Records**

**Documents Redacted in Entirety**

**Henry Yau Medical Records**

**Documents Redacted in Entirety**

**Henry Yau Medical Records**

**Documents Redacted in Entirety**

**Henry Yau Medical Records**

**Documents Redacted in Entirety**

**Henry Yau Medical Records**

**Documents Redacted in Entirety**

**Henry Yau Medical Records**

**Documents Redacted in Entirety**

**Henry Yau Medical Records**

**Documents Redacted in Entirety**

**Henry Yau Medical Records**

**Documents Redacted in Entirety**

**Henry Yau Medical Records**

**Documents Redacted in Entirety**

**Henry Yau Medical Records**

**Documents Redacted in Entirety**

# EXHIBIT C

UNITED STATES OFFICE OF PERSONNEL MANAGEMENT
Washington, DC 20415

October 22, 2024
CSA 9 591 243

HENRY L YAU
[redacted]

Dear Henry Yau,

After review of your application for disability retirement, you have been found to be disabled from your position as a Supervisory Deportation Officer due to left ear sensorineural hearing loss and tinnitus.

This letter is to inform you that your application for disability retirement under the Federal Employees Retirement System (FERS) has been **approved** and to provide information that will be helpful in your transition from employment to retirement. Please note the following steps that must be taken before annuity payments can begin.

**Social Security Administration Awards**
An application for Social Security Disability benefits must be submitted and confirmation must be provided to the Office of Personnel Management (OPM) before annuity payments can begin. Individuals who have not already done so should apply as soon as possible. Individuals who have applied and sent a copy of the receipt do not need to take further action.

**If an individual is awarded a monthly benefit from Social Security Administration, they are required to notify the Office of Personnel Management immediately regarding the amount and effective date of the benefit.** This can be done by sending a photocopy of the award notice or statement showing the monthly benefit amount with the effective date eligibility began. Periodic verification of Social Security Administration records will be conducted to determine unreported awards. Please send the receipt and notification of approval for Social Security benefits to:

**US Office of Personnel Management**
**Retirement Operation Section**
**Attn: Retirement Development Section**
**P. O. Box 45**
**Boyers, PA 16017**

**Interim Payments**
The Office of Personnel Management will notify the corresponding agency regarding the approval of a disability retirement application. The employing agency will then separate the employee from service if not already separated. Records regarding the individual's service time and last day of pay must be forwarded to OPM before interim payments can be authorized. The agency is responsible for forwarding final records to OPM. Interim payments are approximately 80 percent of the amount of the actual monthly annuity payments. Annuitants will continue to receive interim payments on the first business day of each month until final processing is completed for the application for a disability retirement.

Annuitants who are under the age of 62, will receive FERS disability benefits for the first 12 months which is equal to 60 percent of the high-three-year average salary minus 100 percent of Social Security benefits for any month in which they are entitled to Social Security disability benefits. After the first year, disability annuity will be equal to 40 percent of the high-three-year average salary minus 60 percent of Social Security benefits for any month in which they are entitled to Social Security disability benefits. FERS disability benefits usually begin before the claim for Social Security benefits is fully processed. **Because the FERS disability benefit must be reduced by 100 percent of any Social Security benefit payable for 12 months, Social Security checks should not be negotiated until the FERS benefit has been reduced. Checks received from Social Security will be needed to pay OPM for the reduction which will be made in FERS annuity.**

After age 62, annuity payments will be recomputed using an amount which represents the annuity which would have been received had the individual continued working until the day before turning 62 and retiring under FERS non-disability provisions. The total service used in the computation will be increased by the amount of time the annuitant has received a disability annuity. The average salary will be increased by all FERS cost-of-living increases paid during the time a disability annuity was received. The FERS basic annuity formula (1 percent of the high-3 average salary multiplied by the total years and months of service multiplied by any part time proration factor) is then applied, using the adjusted time base and average salary. If actual service time combined with time receiving disability annuitant equals 20 or more years, 1.1 percent would be used rather than 1 percent. The recomputed monthly annuity rate an annuitant receives at age 62 may be lower than the monthly annuity rate received prior to age 62.

**U.S. Dept. of Labor's Office of Workers' Compensation Program (OWCP) Benefits**

Individuals may not receive annuity payments from both OPM and OWCP for the same period of time. However, an annuitant who is eligible to receive a civil service annuity and an OWCP Non-Scheduled Total or Partial Award for the same period of time, may elect which benefit they want to receive. Payments from both OPM and OWCP for the same period of time are authorized only if, (1) OWCP payments are received for a Scheduled (loss of limb or function) Award, (2) OWCP payments are received due to the death of another person and the annuitant is eligible for receiving an annuity on the basis of their own Federal service, or (3) in place of receiving an OWCP Non-Scheduled Total or Partial Award, an individual is receiving a Third Party Settlement from the party directly responsible for their injury. An individual who is receiving OWCP payments but not for one of the three reasons stated above and are also receiving payments from OPM, should contact OPM at 1(888) 767-6738, or by writing to:

**US Office of Personnel Management**
**Retirement Operation Section**
**Attn: Retirement Development Section**
**P. O. Box 45**
**Boyers, PA 16017**

**Recovery Situations**

For annuitants under the age of 60, a periodic review of current medical documentation may be required to verify the status of the claimed condition. Recovery is determined if the medical evidence shows the condition has improved and the essential duties of the position of record can be performed. With such a finding, annuity payments will stop on the first day of the month beginning one year after the date of the medical examination showing recovery. Furthermore, the Office of Personnel Management will honor a written and signed statement of medical recovery voluntarily submitted by an annuitant (provided the medical documentation on file does not demonstrate mental incompetency). Disability annuity payments

will stop on the first day of the month beginning one year after the date of a voluntary statement of recovery.

In the event that an annuitant is re-employed into a permanent position with the Federal Government at any time before age 60 at the same or higher grade/pay level and tenure as the position from which the individual retired, they will be found recovered. Disability annuity payments will stop on the first day of the month following the month of the recovery finding.

In the event that an annuitant is found recovered from any of these situations, the former employing agency is not obligated to rehire the individual into the former position, or any other position. If annuity payments are stopped because an annuitant is found medically recovered, the individual may be eligible for a deferred annuity at age 62 or at an earlier date if the service criteria for a discontinued service retirement are met.

**Restoration of Earning Capacity**
If a disability annuitant is under the age of 60 on December 31 of any calendar year, and his or her income from wages or self-employment or both during that calendar year equals at least 80% of the current rate of basic pay of the position occupied immediately before retirement, the annuitants earning compacity is considered to be restored. The disability annuity will terminate on the June 30th after the end of the calendar year in which earning capacity is restored.

**Medicare**
An annuitant who believes they may qualify for Medicare should contact the Social Security Administration promptly at 1-800-772-1213 to make arrangements for filing an application. A delay in filing could result in a delay in the date in which Medicare entitlement begins.

**Reporting Responsibilities**
It is important to notify the Office of Personnel Management of any changes to status such as becoming re-employed with the Federal Government, changes to marital status, or changes to address. This information can be reported, and questions can be answered at the contact information below. Please include your Civil Service Annuity (CSA) claim number on any correspondence and keep this letter for future reference.

**Retirement Information Office: 1(888) 767-6738**
or please write to:
**US Office of Personnel Management**
**Retirement Operation Section**
**Attn: Retirement Development Section**
**P. O. Box 45**
**Boyers, PA 16017**

For more information about disability retirement, please visit http://www.opm.gov/retire

Sincerely,
Judith S.
Medical Specialist
Boyers Disability Section

CC: Harris Federal Law

HARRIS FEDERAL LAW
2343 ALEXANDRIA DRIVE
SUITE 400
LEXINGTON KY 40504

# EXHIBIT D

**Letter from Dr. Page Yin, dated July 17, 2026**

**Document Redacted in Entirety**

**Letter from Dr. Page Yin, dated July 17, 2026**

**Document Redacted in Entirety**

**Letter from Dr. Page Yin, dated July 17, 2026**

**Document Redacted in Entirety**

# EXHIBIT E

**Medical Records for Yuk K. Yau and Jack Yau**

**Documents Redacted in Entirety**

**Medical Records for Yuk K. Yau and Jack Yau**

**Documents Redacted in Entirety**

# EXHIBIT F




NIKE


NIKE

# EXHIBIT G

The Honorable Colleen McMahon
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street New York, New York 10007

Dear Magistrate Judge McMahon:

My name is Suzanna Yau, and I am writing this letter on behalf of my brother, Henry Yau. I respectfully offer my perspective regarding his character and ask the Court to consider the many positive qualities he has demonstrated throughout his life. Based on my experiences and the time I have spent with him as his sister, I believe he is a responsible, honest, hardworking, reliable, and caring individual who deserves another chance.

One of Henry's strongest qualities is his deep sense of responsibility, particularly toward our family. As my own responsibilities increased with the need to care for my young children, Henry stepped in and assumed many of the responsibilities for our parents. He took charge of our father's daily care, including his hygiene, meals, and medical needs. He managed countless doctor appointments, medication schedules, and follow-up care until our father's passing.

His daily responsibilities included bathing our father, changing soiled diapers and linens, preparing meals, and pureeing food to ensure he would not choke due to his difficulty chewing and swallowing. Since our father's death, Henry has continued to show the same level of commitment in caring for our mother. Due to her advanced age, declining health, and memory issues, she relies heavily on him for her daily needs. When I ask my mother questions about her medical appointments or medications, she often tells me to ask Henry because he manages those aspects of her care. Henry has become an essential part of her daily life, and I fear she would be unable to live independently without his assistance.

One particularly heartbreaking example occurred when I encouraged my mother to resume taking walks around Chinatown to help with her joint stiffness, something she once did regularly without hesitation. She responded that she would only go if Henry accompanied her. He has truly stepped into the role of a dependable caregiver and companion, always willing to be by her side and provide the support she needs.

Henry is also an exceptionally honest and fair person. I recall an incident many years ago when our father gave Henry a substantial amount of money from his savings. Henry immediately recognized that it would not be fair for him alone to receive such a gift. He spoke with our father and ensured the money was divided equally between us. He has always been someone who refuses to keep anything he believes does not rightfully belong to him.

Another example occurred during a church outing when we were children. Henry found money in a park and immediately turned it over to our priest. Although the priest later returned the money to him, Henry chose not to keep it. Instead, he used it to buy ice cream for members of the church group. This act reflected the fairness, honesty, and integrity that have always been part of his character.

Henry has always been a hardworking and dedicated individual. Henry willingly stepped forward to serve, accepting temporary duty assignments that often required personal sacrifice. This included spending a year

away from his family as an instructor to help train and mentor new officers. He was the first in his Special Response team to achieve sniper certification. His efforts as an intelligence officer were recognized through honors including the ICE Directors Protecting the Homeland award. This same work ethic and sense of responsibility were already evident during his college years, when he balanced multiple jobs while attending school and graduated without taking on student loan debt.

My brother is also remarkably dependable. I have come to rely on him in many aspects of our family's life, particularly regarding our mother's care and family responsibilities. Whenever he visits, he willingly helps with daily tasks, including transporting my children to and from school and extracurricular activities. He always asks how he can help and never hesitates to take on ordinary household chores, such as tidying up after the children or washing dishes.

As an uncle, Henry is exceptionally kind and caring toward my three children. His reliability extends far beyond everyday tasks. During the difficult period following our father's passing, Henry played a critical role in helping with funeral arrangements and making important decisions. Having someone to lean on during such a painful time was invaluable. He provided practical support, guidance, and stability when our family needed it most. His willingness to shoulder responsibility during one of the most difficult periods of our lives is something I will always appreciate.

Henry also brings calm and stability to family situations. Over the years, he has often served as a mediator between my husband and me during disagreements. My husband has contacted Henry on numerous occasions because he trusts Henry's ability to listen objectively, communicate respectfully, and help de-escalate tense situations. Henry is diplomatic, thoughtful, and genuinely wants to help resolve conflicts peacefully.

Another quality that stands out is his trustworthiness. He consistently follows through on his commitments and always repays loans that he borrowed from me. Within our family, he is the person I trust most when discussing personal problems or seeking advice. Whenever issues arise, especially those involving our parents, Henry is usually the first person I call. He is a natural problem solver who approaches challenges thoughtfully, responsibly, and with genuine concern.

I would also like to provide some cultural context regarding our upbringing as Chinese Americans. We were raised with strong values emphasizing generosity, reciprocity, and putting the needs of family and friends before our own. Our mother always taught us that when someone helps you or gives you something, you should reciprocate whenever possible. Examples include never arriving at a friend's or family member's home empty-handed and always returning hospitality with kindness and generosity. Certain actions may be misunderstood when viewed outside of this cultural context, and I respectfully ask that these values be considered when evaluating my brother's conduct.

Most importantly, I believe Henry genuinely regrets his actions and accepts responsibility for them. While I fully understand the seriousness of the matter before the Court, I respectfully ask that his entire character and life history be taken into consideration. The Henry I know is someone who consistently helps others, supports his family, works hard, and strives to do the right thing.

I sincerely believe my brother deserves another chance. His absence would be deeply felt by both my mother and me because of the emotional and practical support he provides. He plays a vital role in our family, particularly in caring for our mother. I truly believe it would be devastating for her if he were no longer able to be present in her life. His absence would have a significant negative impact on our family, and I respectfully ask that he be given the opportunity to be a continued support for the family.

Thank you for taking the time to read this letter and consider my thoughts regarding my brother's character. I respectfully ask the Court to consider alternatives to incarceration and to give meaningful weight to the positive impact Henry has had on our family.

Sincerely,

Suzanna Yau

The Honorable Colleen McMahon
United States District Judge
United States District Court
Southern District of New York

Dear Judge McMahon,

My name is Lily Lau, and I am writing this letter in support of my partner, Henry Yau, whom I have been in a committed relationship with for over three years. I am grateful to have had the opportunity to truly know Henry during this time—not only as my partner, but also as the caring and devoted person he is to the people he loves.

To me, Henry has shown time and time again that family always comes first. One of the things that has touched me the most is seeing how caring and devoted he was to his father while his father was still alive. As a single mother, I understand how difficult it can be to care for another person every single day and to put someone else's needs before your own. However, the way Henry cared for his father, who had Parkinson's disease, was unlike anything I had ever seen before.

I witnessed his patience, dedication, and the way he consistently attended to his father's everyday needs. It was not something he did only when it was convenient. He showed up day after day, with patience and love, even when I knew it could not have been easy. Seeing the level of care and commitment he gave to his father showed me the depth of his character and the kind of son and person he truly is.

What makes this even more meaningful to me is that while caring for his father and putting so much time and energy into his family's needs, Henry was also working a demanding full-time job as a supervisor—a role that required his time, attention, and responsibility. He carried these responsibilities at the same time, yet continued to show up for his family. I have honestly never met someone as hardworking and dedicated as Henry. Especially after the pandemic, I often saw people struggle with consistency and work ethic,Henry has continued to demonstrate an incredible sense of responsibility, discipline, and commitment. He does not shy away from his responsibilities or look for the easy way out. He simply works hard and does what needs to be done for the people who depend on him.

After his father passed away, I saw Henry go through the difficult process of grieving and healing. Even during that time, his commitment to his family never changed. As he continued to cope with the loss of his father, I watched him continue caring for his mother day by day. He takes her to her appointments, helps with her needs, and continues to make sure she is cared for and not alone. As we all know, caring for a senior is not always easy. It takes patience, time, energy, and a great deal of compassion. Henry continues to show all of these qualities through his actions.

His care for his family does not stop with his parents. I have also seen him help his sister with her three daughters, his nieces. He is always willing to step in and help when his family needs him. Seeing the way he supports his mother, his sister, and his nieces has continued to show me that for Henry, family is not just something he talks about—his actions truly speak louder than words.

Henry has become such an important and cherished part of my life and my family. Throughout our relationship, he has been my rock. During some of my most difficult moments, he has stood by my side and provided me with emotional support, encouragement, comfort, and stability. I have come to know him as someone who is caring, dependable, responsible, and genuinely compassionate.

I am divorced and have two daughters, ages 17 and 15. Henry has embraced them with kindness, patience, and respect. He has never made them feel like they were separate from his life. Instead, he has built a meaningful relationship with both of them and has become someone they know they can trust and rely on. He has been a positive and important presence in their lives, and on numerous occasions, he has also supported our family financially when we needed help.

What means the most to me is that Henry never hesitates to step up when I need him. Whether we are dealing with everyday challenges or more difficult circumstances, he is always willing to help. He takes our family's well-being seriously and does so because he genuinely cares. His support has never felt like an obligation—it comes from his heart.

I truly believe that Henry's actions speak louder than words. He does not simply tell us that he cares—he shows us through the way he consistently supports, protects, and stands by us. Time and time again, he has shown up when we needed him most. The love, patience, and support he has given to me and my daughters are a reflection of the kind of person he truly is.

Henry has made a truly positive and meaningful difference in my life and in the lives of my daughters. I am proud to have him as my partner, and I feel incredibly fortunate to have him by our side. I sincerely hope that Henry's character, his actions, his love and dedication to his family, and the genuine nature of our relationship will be taken into consideration.

Sincerely,



Lily Lau

Dear Judge,

Hi. My son, Henry Lopfun Yau (丘立勳), is someone I need to take care of me because I am 80 years old and need his assistance with many aspects of my daily life.

I frequently need to use the bathroom and have difficulty walking and moving around. Every day, my son helps me prepare breakfast, lunch, and dinner. He also helps me shower and do my laundry.

Whenever I go outside, my son holds on to me and supports me while I walk. Without my son's help, I cannot go anywhere by myself. I am at risk of falling, and I frequently feel dizzy.

I need my son to accompany me whenever I go out because I have problems with my brain and sometimes don't remember things. I therefore rely on my son to help me with these matters.

My son has a kind heart, is responsible, and is trustworthy. I truly need his care and assistance in my daily life.

丘古玉
Yau Koo Yuk

法官，您好。

我儿子立魁 Henry，我需要他照顾，因为我年纪有上，各方面都要他照顾，妈妈经常都要说关节疼痛，行动不方便，每天都要儿子帮妈妈做早餐、午餐、晚餐，他还帮忙洗菜、洗衣服，很多出街行路拉着我走，如果没有儿子帮助[illegible]我，到处不能去。我还气喘问题，我经常有头晕，我是儿子带我出去。因为我脑有问题，有多時不记得日子事情，需一直要儿子帮忙。我儿子心地善良，为人孝顺[illegible]，且值得信赖。

[illegible]

丘 [illegible]

[illegible]

[redacted]

[redacted]

Andrew.miller123@gmail.com

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Sincerely,

Vincent Wong, MD

[redacted]

To whom it may concern,

My name is Jun Lee and I've known Henry Yau since 3rd grade. We've attended the same school during Elementary, Junior High School and High School with the exception of College/University. We are childhood friends and our family have come to know each other as well.

The first time I went up to Henry's home was sometime in Junior High School to help his sister fix/troubleshoot her computer. That's the first time I visited his home and got to know his family on a more familiar level.

From young, Henry's impression on me is that he's always playful and always carries a smile. I still remember the day in High School that he had a short, but serious conversation with me. May not be in the exact wording, but the general question he asked me is "Jun Wai, do you know that we have to study hard to have a good job and earn more so we have time and money to enjoy in the future? Without education, we may not have a good job and earn minimum wage, even with time, there's no money to enjoy life." My response to him is that I know the general idea and he asked why I didn't tell him. I then responded, I thought this is common knowledge. From that day forward, I've seen Henry studying harder and his grades started to improve.

After college/University, I joined the US Army and on my first trip home from my first deployment, we had a group gathering with our fellow Elementary friends, including Henry and myself, there were 4 of us. This is when we started communicating and seeing each other again every time I come home for vacation from the Army. We interacted more frequently after my service in the Army and finding a job back home (New York City).

I've gone on events with Henry and his girlfriend, Henry and his friends, and we've gone on double dates between Henry & his girlfriend and myself & my wife. On these outings, we've always split the cost evenly. The only exception is when Chinese families, friends and relatives go out to tea/dim sums, where there is only one ticket to calculate the final bill. It's almost an unwritten rule/culture that everyone will fight for the ticket to pay the bill. If one loses the "fight" to pay the bill, then it can only be remembered and tried to repay them by footing the next bill. Favors/debt like these among family, relatives and friends can only be repaid with the next available meal (Chinese tea/dim sums).

Financially, I've always seen Henry being frugal on most things except when it relates to his friends, his girlfriend(s) and regarding his family. Henry has always lived with his parents in a rent control apartment and the rent split among his siblings. I believe Henry is saving a lot on this aspect and made it possible for him to invest and earn more financially where possible. Henry has boasted about his investments, especially among his real estate properties where he's collecting rent to pay for the property's mortgage. Henry have put the term "using money to make money" to practical use.

There are also times when Henry is short on funds when his monies are tied up in investments. I remember a time when he asked to borrow money from me and we've even drafted up a loan repayment contract and have it notarized. He promised interest on the personal loan, but I refused the interest payment due to our friendship. Henry had repaid the loan principle on the promised due date. This is the only instance he had borrowed money from me.

I believe the time when we started to lose contact or have less frequent communications is after my son's birth and shortly after, COVID-19 started. We would still keep in touch from time to time and from those conversations, I know Henry is a good uncle to his sister's children.

In summary, Henry is a good friend, a good sibling, a good uncle and most of all a good son to his parents. Henry likes to play and enjoy life, yet has a prospect of what he wants for his future. Since that day we had that short and serious conversation in High School, Henry has always been working toward his goal to have financial freedom so he can enjoy life.

Sincerely,

____________________

Jun Lee