**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

November 13, 2026

**BY CM/ECF**
The Honorable Colleen McMahon
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

**Re: *United States v. Henry Yau,* 23 Cr. 572 (CM)**

Dear Judge McMahon:

Defendant Henry Yau is scheduled to be sentenced on November 18, 2026 after pleading guilty to participating in a conspiracy to receive and accept bribes and gratuities, in violation of 18 U.S.C. §§ 371 and 201. Between at least in or around 2016 and in or around 2024, the defendant—a former Immigration and Customs Enforcement ("ICE") Supervisory Deportation Officer—participated in a long-running scheme to obtain bribes and gratuities in exchange for disseminating confidential government information and processing the entry of foreign nationals and other individuals into the United States. As part of this scheme, the defendant also arrested an individual who had been participating in a bank fraud conspiracy and was threatening to report the scheme to law enforcement ("Victim-1"). In total, the defendant improperly disclosed confidential government information regarding at least 28 individuals to approximately 12 co-conspirators, and he accepted over $12,000 in cash, meals, bottles of alcohol, and other things of value in exchange for these official acts and violations of duty. As further explained below, the defendant also engaged in a series of frauds against the Small Business Administration, New York State's Emergency Rental Assistance Program, the Federal Employee Education and Assistance Fund, and New York State Medicaid, stealing at least $175,000 from these government programs. The Government respectfully submits that a sentence within the Guidelines range of 30 to 37 months' imprisonment is necessary here to account for this corrupt, fraudulent, and dangerous conduct. The Government also requests that the Court impose a fine within the Guidelines range of $10,000 to $100,000.

## I. Offense Conduct

<u>Overview of the Bribery and Gratuity Scheme</u>

Defendant Henry Yau was hired by ICE as a Deportation Officer in or about 2009, and he was promoted to Supervisory Deportation Officer in or around September 2021, a post he held until in or about November 2024, when he voluntarily resigned.

At all relevant times, the defendant was assigned to the ICE New York Field Office in Manhattan. ICE's stated mission includes protecting the United States through criminal investigations and enforcing immigration laws to preserve national security and public safety. As an ICE Deportation Officer, the defendant was given access to several password-protected law enforcement databases operated by the Department of Homeland Security ("DHS") and other law enforcement agencies, including United States Citizenship and Immigration Services ("USCIS") databases containing the status of immigration-related applications filed by aliens, Customs & Border Protection ("CBP") databases containing information about border crossings, criminal history databases, and ICE databases containing records relating to arrests and removals of aliens from the United States. (PSR ¶ 44).

Co-defendant Kevin Seto[1] was employed by CBP from in or about March 2013 through in or about December 2025 as a Customs and Border Patrol Officer. Seto's responsibilities include processing international travelers who seek entry into the U.S. at JFK Airport. Additionally, as a CBP Officer conducting passport inspections of international travelers seeking entry into the United States at JFK Airport, Seto had discretion regarding whether travelers appearing before him would be subject to an enhanced screening—commonly known as a "secondary inspection"—during which CBP officers conduct further assessment of travelers, their documents, and belongings, which can include interviews, searches of luggage and electronic devices, and further database inquiries to ensure admissibility.

Seto also had the discretion to conduct expedited processing of international travelers through a booth reserved for foreign diplomats, which is frequently known as an "Immediate Attention Request" or an "IA." International travelers who receive an IA are able to proceed to a shorter line at passport control and receive expedited screening at the port of entry. International travelers who receive an IA are frequently met by law enforcement officers at the arrival gate and personally escorted through passport control and customs. Ordinarily, international travelers who are granted an IA are pre-screened and pre-approved for the process, and the DHS employee who requests the IA cannot be involved in the actual border crossing. As further discussed below, the defendant and Seto conspired to informally arrange for certain individuals to receive the equivalent of an IA from Seto or other CBP officers without any prescreening. (PSR ¶ 45).

From at least in or about 2016 through at least in or about 2024, the defendant and Seto participated in a scheme to obtain bribes and gratuities in exchange for disseminating confidential law enforcement and immigration information and processing the entry of foreign nationals and other individuals into the United States. For example, between in or about 2019 and in or about 2020, the defendant agreed to and did disclose confidential information from law enforcement databases about Victim-1, who co-defendant Tommy Lin was seeking to have arrested and deported from the United States on behalf of other members of a bank fraud conspiracy, including co-defendant Daniel Chieh. The defendant shared with Lin a copy of an ICE Field Operations Worksheet containing personal identifying information about Victim-1 prior to arresting Victim-1, including Victim-1's address and criminal history. In October 2020, the defendant arrested

---

[1] Seto is currently charged with participating in a conspiracy to receive and accept bribes and gratuities, in violation of 18 U.S.C. §§ 371 and 201, among other crimes, in a case pending before the Court. *See United States v. Seto*, 26 Cr. 279 (CM).

Victim-1, and the defendant sent photographs of Victim-1 sitting in ICE custody to Lin following the arrest. In total, the defendant improperly disseminated confidential government information relating to at least approximately 28 individuals. This information came from DHS databases, and the defendant disclosed it without any law enforcement purpose to at least approximately 12 non-law enforcement personnel, including, among others: (1) co-defendant Tommy Lin—a former Director of Constituent Services within the New York City Mayor's Office; (2) a former candidate for New York City Council and New York State Assembly ("CC-1"); (3) Hiu Kit David Chong, a/k/a "Hk David,"[2] who was a target of a fraud investigation being conducted by the FBI in California; and (4) a former business partner ("CC-2"). (PSR ¶¶ 46-48).

Additionally, the defendant and Seto conspired to assist various foreign nationals and other bribe-payors by disseminating confidential government records to them and expediting their entry into the United States, including at least three different foreign nationals. The defendant and Seto did so by circumventing the policies and procedures for IAs at JFK Airport and arranging for these foreign nationals to get expedited entry into the United States without secondary inspections, thereby allowing these foreign nationals to be subjected to less scrutiny at the border. For example, in or around February 2023, the defendant and Seto conspired for a foreign national who was attempting to smuggle contraband (fish roe) into the United States to receive an IA. In other words, foreign travelers receiving an IA (and their luggage) did not undergo the same search and safety precautions as other foreigners entering the United Sates. These foreign nationals were also guaranteed not to be subjected to a secondary inspection by CBP. (PSR ¶ 49).

Below are some of the most prominent examples of the defendant and Seto's scheme:

<u>Dissemination of Confidential Government Information and Arrest of an Individual for Co-Defendant Tommy Lin</u>

Beginning in or around 2019, members of a bank fraud conspiracy, including co-defendants Daniel Chieh and Tommy Lin, began discussing the need to arrange for Victim-1, a disgruntled accountholder who had previously participated in the scheme, to be arrested by ICE. As part of the scheme to arrest Victim-1, Lin provided the defendant with a copy of Victim-1's driver's license, and the defendant provided Lin with a copy of a document designated as "law enforcement sensitive" that was prepared in advance of the defendant's arrest of Victim-1 for being in the country illegally. The document contained personal identifying information about Victim-1, including Victim-1's name, address, and criminal history. During a search of Lin's cellphone, law enforcement found a photograph of an individual holding the law enforcement sensitive document relating to Victim-1, which was saved to the cellphone on September 8, 2020—approximately seven weeks prior to Victim-1's arrest by ICE. In text messages between Lin and the defendant in or around August 2019, Lin also asked the defendant whether the defendant could "detain somewhere in Delaware" and sent a screenshot of a Delaware driver's license of another individual that Lin was seeking to have arrested by the defendant. The defendant responded that

[2] Chong is currently charged in a criminal complaint with conspiracy to receive and accept bribes and gratuities, conspiracy to convert records and property of the United States and disclose agency records containing individually identifiable information, and identity theft conspiracy. *See* 25 Mag. 3861.

he would have to refer it to ICE in a different state and offered to "run him" in law enforcement databases. In another text message exchange, Lin asked the defendant whether the defendant could check ICE databases for information about whether a "friend of mine" passed their citizenship interview. The defendant then instructed Lin to switch their conversation to WeChat, an encrypted messaging application. Lin received a payment of $20,000 from other members of the bank fraud conspiracy for arranging for Victim-1's arrest, and in the months following the arrest, Lin gave a quantity of cash to the defendant, as well as a watch worth several hundred dollars. (PSR ¶¶ 50-52).

During an interview with FBI officers in June 2024, the defendant admitted that he "likely" and "probably" gave information from an ICE Field Operations Worksheet to Lin. The defendant also admitted that he "likely" and "probably" accepted things of value from Lin—including a G-Shock watch, liquor, and dinners—although he falsely claimed that these items were exchanged as part of a mutual friendship and were not bribes or gratuities. The defendant acknowledged that it would be an "egregious violation" for him to divulge personal identifying information from a government database to a third party, but falsely denied that Lin or anyone else had ever attempted to get personal identifying information from him. When asked about using the WeChat messaging application, the defendant falsely stated: "I stay away from that." (PSR ¶ 53).

<u>Dissemination of Confidential Government Information and Border-Related Assistance to Hiu Kit David Chong, a/k/a "HK David"</u>

In October 2018, Hiu Kit David Chong exchanged a series of messages with the defendant in which Chong requested that the defendant provide information about the immigration status of a young woman seeking to enter the United States. The defendant looked up the woman's information in a confidential law enforcement database and shared it with Chong. Chong thanked the defendant for checking the law enforcement database and said: "I owe you a big meal." The defendant responded: "Na brother. I got u." Later in the exchange, the defendant bragged to Chong that he conducts immigration raids of "massage place[s]" and gets to "check immigration status of the girls." The defendant also offered to Chong that, "[i]f you give me name and date of birth, I can get photos and tell you if they are pretty or not pretty." Chong also said to the defendant: "Will they know you have check her record ? Don't want to get u in trouble , bro." The defendant responded: "I'm good bro. I'm in a special unit. Haha." (PSR ¶ 55).

In December 2018, Chong asked the defendant to check whether immigration databases had any restrictions or flags on Chong's travel outside of the United States. The defendant checked the databases and told Chong that there were no restrictions, and Chong replied: "Cool, then I am going to have a vacation." Later, Chong asked the defendant about whether Hong Kong or China would extradite him to the United States. (PSR ¶ 56).

In January 2020, Chong asked the defendant to check Chong's name in law enforcement databases, and the defendant informed Chong that he was under investigation by federal authorities in California. Chong asked Yau if it was an arrest warrant or just an investigation, and Yau informed Chong that it was "[j]ust an investigation." Chong then said to Yau: "Well, thank you Henry, I deleted my message with you, so as not to cause any trouble, thank you." In or around April 2020, Chong agreed to plead guilty to participating in a fraudulent scheme to admit

unqualified international students to a prominent research university in Southern California. (PSR ¶ 57).

In October 2022, Chong asked the defendant to check immigration databases regarding a "friend's friend [who] was sent back to China." The defendant checked the individual in law enforcement databases and informed Chong that the "guy wanted by the china for sexual assault." The defendant also informed Chong that this person's asylum case in the United States had been rejected and denied. (PSR ¶ 58).

In February 2023, the defendant conducted a database check on behalf of Chong to see if an individual had a "look out" in immigration databases because the individual was a legal permanent resident who had been living outside the United States for over three years without having returned to the United States. In March 2023, the defendant and Seto agreed for Seto to expedite the individual's entry into the United States at JFK Airport. The defendant described to Chong the type of treatment that Seto was able to provide: "Don't ask any questions haha" | "VIP treatment" | "But only do it for people who are good frds." (PSR ¶ 59).

In November 2023, Seto assisted with expediting the entry of Chong and Chong's girlfriend into the United States. While checking Chong's name in law enforcement databases, Seto learned that Chong had been previously arrested and convicted of federal law enforcement. Seto also claimed that he checked databases to "make sure the girl he's bringing doesn't have any problems." Seto told the defendant that "the girl also has a case but it's over came" | "she overstayed and has a baby in guam" | "She's a visitor from China with b1/b2." During this conversation, Seto joked that the defendant was the "one that introduced me to your criminal friends." The defendant responded: "We all get introduced to people in our course of our lives, is your choice if you decide to help them or interact with them, you're an adult. Don't blame anyone else." (PSR ¶ 60).

In consideration for illicit actions performed by Seto and the defendant, Chong provided the defendant and Seto with things of value. In or about January 2020—during the same conversation when Chong asked the defendant about whether he was under investigation—the defendant offered to provide advice about potential real estate investment opportunities in China. In or about August 2022, the defendant, Seto, and Chong discussed how Chong had obtained for Seto a discounted hotel suite at the price of $490 for three nights, as opposed to the normal price of $1,400 for three nights. In February 2023, the defendant checked on the status of a permanent resident for Chong, and Chong offered $500 to the defendant, offering to provide the money to the defendant through an intermediary. Chong also offered to "treat you to a meal next time – either way is fine." The defendant responded to save up the money for a future trip to Thailand. Chong promised that "I will pay for our next party" and the defendant responded affirmatively. The defendant then sent information from immigration databases to the defendant and said: "You can just let him see it, don't send this image to him." Approximately two weeks later, Chong said that "Kevin [referring to Seto] processed" the individual, and said: "I will treat you guys to meals or fun stiff next time we meet, whatever it may be." In June 2023, Chong asked the defendant for information about an international student's immigration status, and the defendant confirmed that the visa was still active. Chong responded: "I am going to charge him more" | "For our VIP table in Vietnam or Thailand haha." (PSR ¶ 61).

Dissemination of Confidential Government Information to CC-1

CC-1 was recently a candidate for City Council in New York City and the New York City State Assembly. On multiple occasions, the defendant provided information from confidential law enforcement databases to CC-1. The defendant also received things of value from CC-1, including tax advice from CC-1's accountant. (PSR ¶ 62).

In or around July 2016, the defendant assisted CC-1's family with receiving expedited entry into the United States at JFK Airport. The defendant drafted an email to a CBP supervisor at JFK Airport falsely claiming that the request for expedited entry was for his own "mother in law" rather than CC-1's family. The defendant later told CC-1: "Yo bro I called the Yo bro I called the chief Office. It was approved! They said they will try to send somebody out there but Usually how it works is I would go there myself or have you with me, and we could pick up the mother together. The next time we can do that. It would impress her." (PSR ¶ 63).

In or around June 2018, the defendant offered to tell CC-1 "if you have any frds reporting to immigration from now on . . . I'll check it for you and tell u if they gonna take them into custody or not if they report." (PSR ¶ 64).

In or around March 2019, the defendant checked the immigration status of an individual on behalf of CC-1 and told CC-1 that the individual's asylum status was granted and permanent residency application was pending. The defendant also told CC-1 that there had been a "frauds check" on the permanent residency application because the individual's name and address had changed in 2016. The defendant took a photograph of his computer screen showing the individual's photograph, fingerprint, signature, and other personal identifying information, which he transmitted to CC-1. The defendant also sent screenshots showing the history of the individual's permanent residency application. (PSR ¶ 65).

In or around June 2019, the defendant checked the immigration status for an individual that "owes [CC-1] fd $$." The defendant told CC-1 that the individual was applying for asylum and came in for a visitor visa, and provided data about when the visitor visa expires. The defendant also sent to CC-1 a photograph of the individual from immigration databases. (PSR ¶ 66).

Dissemination of Confidential Government Information to CC-2

In or around June 2019, the defendant checked immigration databases for CC-2, one of Yau's former business partners, regarding another person's immigration status who CC-2 was inquiring about getting arrested and detained by ICE. The defendant replied that the individual got permanent resident status in 2016 after coming into the United States illegally, as a result of having a child born in the United States. The defendant told CC-2 that the only way to arrest this individual was for the individual to be convicted of a crime. CC-2 complained that the individual was trying to extort CC-2's friends and said that CC-2's friend wanted to "scare him and say to just back off." The defendant then offered to check the individual's spouse or wife to arrest them if possible ("I'll take them if they takable."). During the exchange, the defendant sent CC-2 a screenshot of the individual's photograph from immigration databases. (PSR ¶ 67).

In the same conversation, CC-2 also requested that the defendant check immigration databases for a female individual, and the defendant provided CC-2 with a screenshots from immigration databases showing the individual's name, address, and photograph—again suggesting that CC-2 wished for the defendant to arrange for the female's arrest by ICE. The defendant told CC-2 that the female was a US citizen as of 2015. CC-2 then told the defendant that he believed the female had done "fake marriage" to get US citizenship and said to the defendant: "U can threaten her about it. Any last know address?" (PSR ¶ 67).

In July 2019, the defendant checked immigration and law enforcement databases for the name and phone number of the boyfriend of CC-2's ex-wife or girlfriend. CC-2 also asked the defendant to check immigration databases for CC-2's ex-wife/girlfriend and transmitted to YAU a copy of the woman's Hong Kong permanent identity card. CC-2 asked YAU: "Can you run when . . . came into usa and at which entry point" . . . see when and where she came in at for me." The defendant then provided a screenshot from immigration databases for CC-2's ex-wife, including name, date of birth, citizenship, passport numbers, gender, flight history in and out of the country, and border crossing history. The defendant told CC-2: "Do not disseminate that pic" | Do not send anyone else that pic" | "I don't like to leave records." (PSR ¶ 68).

In July 2021, the defendant checked immigration databases to see the status of CC-2's application for enrollment into the DHS Global Entry program. (PSR ¶ 69).

Assistance with Expedited Border Crossing of Family Members of a Foreign National ("CC-5")

Between on or about April 20, 2023 and on or about April 21, 2023, the defendant, Seto, and another co-conspirator worked together to expedite the entry of CC-5's family into the United States. During their text message conversations, the defendant stated: "I'll swap with you next time you go to JFK". The defendant responded: "I did the last 3 IAs for our mutual friends" | "It's your turn." The defendant responded: "It's not about taking turns, I'm passing the torch to you." | "Passing the torch means it's your turn all the time." Seto later said: "Let's see what we get from [CC-5]." The defendant responded: "Your right a couple of bottles of liquor ain't worth it." | "He better give us something." During this discussion, the defendant and Seto joked about the amount of liquor they had each received from CC-5 in the past in exchange for providing assistance to CC-5:

| | |
|---|---|
| **Defendant:** | Kevin got $1000 worth of bottles from him and not going to the airport |
| **Defendant:** | He's a sad man |
| **Seto** | Henry [*i.e.*, the defendant] got $15k worth of liquor from him and sold it all for cash and didn't spread the wealth |
| **Defendant:** | Hahahha |
| **Defendant:** | That's not true |
| **Defendant:** | More like $1000 |
| **Defendant:** | You got more in one shot then I got in 10 years |
| **Seto** | Yeah right, I have no value in bottles which will be drunk and peed out |
| **Seto** | Henry [*i.e.*, the defendant] got real $ |
| **Seto** | Cold cash |

After the defendant provided assistance to CC-5's family members with the expedited entry at JFK airport, Seto texted the defendant: "Good job boys, now wait and get invited to one of [CC-5]'s dinners." (PSR ¶ 73).

<u>Theft of Confidential Government Records in 2024</u>

In June 2024, FBI agents executed a personal electronics search warrant for the defendant's cellphone and interviewed the defendant regarding his relationship with co-defendant Tommy Lin. Immediately following that interview, the defendant began taking steps to file a claim for disability benefits. The defendant resigned from ICE in or around early November 2024—approximately five months after the FBI approached the defendant in connection with this investigation. On or about November 19, 2024, ICE's Office of Professional Responsibility conducted an audit of the defendant's network usage and found that on or about November 1, 2024 and on or about November 2, 2024, the defendant's login credentials were used to copy thousands of files to a removable media device, which included, among other things, documents marked as law enforcement sensitive, documents containing personally identifiable information, pictures, emails, guides, forms, and passwords to both government and private platforms. On or about November 21, 2024, law enforcement agents arrested the defendant. During the defendant's presentment, the Government informed the magistrate judge that the defendant's login credentials had been used to download thousands of files to a removable media device. When the magistrate judge suggested that the defendant would be detained pending the Government's application for a search warrant, the defendant consented to a search of his residence and provided to law enforcement the location in his residence where he had saved the hard drive with the exfiltrated data. (PSR ¶ 74).

<u>Other Criminal Conduct by the Defendant</u>

During the investigation, the FBI also discovered text messages by the defendant indicating that the defendant had filed a fraudulent application for a Small Business Administration ("SBA") loan during the COVID-19 pandemic, falsely claiming that the defendant had business and rental income losses. The defendant also admitted that he placed false information on his 2021 tax return to ensure that he received the loan, falsely claiming that his business had significant losses but still obtained $60,000 in rental income the prior year. At one point the defendant told Seto: "And last year I actually reported a loss of rental income loss of 30k so it looked legit." Seto stated to the

defendant in February 2023: "I know, you don't listen to me after I guided you on scamming the SBA." Based on records from the SBA, the defendant received approximately $215,000 from the SBA, including approximately $15,000 in grants and $200,000 in low interest loans. (PSR ¶ 75).

Additionally, the defendant and one of his rental tenants conspired to defraud New York State's Emergency Rental Assistance Program in or around 2021. Text messages indicate that the defendant and the tenant fraudulently obtained approximately $20,000 from the program. In the defendant's cellphone, the defendant also had a picture of a $1,000 check from the Federal Employee Education and Assistance Fund, and the defendant mentioned this fund as one of the sources of their fraud proceeds. (PSR ¶ 76).

The defendant also participated in a fraud on New York State Medicaid, involving the care of the defendant's elderly parents. Specifically, the defendant, the defendant's siblings, and the defendant's ex-girlfriend agreed to submit fraudulent timesheets to the New York State Medicaid program dramatically exaggerating the number of hours that were spent providing home care to the defendant's parents between at least in or around 2018 and in or around November 2024. The FBI conservatively estimates that the scheme would have yielded at least $36,000 per year in gross proceeds, and based on text messages between the defendant and others, it appears that a substantial portion of the hours being reported were fraudulent. For example, the text messages indicate that certain individuals reporting hours had no intention of actually providing care to the defendant's parents at all, and on multiple occasions, there were physical accidents that occurred involving the defendant's elderly parents that could have been prevented and/or more quickly remedied if someone had been in the home actually providing care. Additionally, at one point in the text messages, the defendant and another individual conspired to circumvent a home health care company's rule preventing an elderly parent from being billed for more than 40 hours of care per week from a family member. (PSR ¶ 77).

## II. Procedural History and Guidelines Range

On November 21, 2024, the defendant was arrested after being charged in a criminal complaint. A grand jury returned an indictment on or about December 12, 2024 charging the defendant with participating in an identity theft conspiracy, in violation of 18 U.S.C. § 1028(f) (Count Five); four counts of participating in a conspiracy to convert records and property of the United States and disclose agency records containing individually identifiable information, in violation of 18 U.S.C. §§ 371 and 641 and 5 U.S.C. § 552a(i)(1) (Counts Six through Nine); conversion of records and property of the United States, in violation of 18 U.S.C. §§ 641 and 2 (Count Ten); and disclosure of agency records containing individually identifiable information, in violation of 5 U.S.C. § 552a(i)(1) (Count Eleven).[3]

On March 26, 2026, the defendant pleaded guilty pursuant to a plea agreement to participating in a conspiracy to receive and accept bribes and gratuities, in violation of 18 U.S.C. §§ 371 and 201. (PSR ¶¶ 1-2). Pursuant to U.S.S.G. § 2C1.1(a)(1), the parties stipulated that the base offense level is 14 because the defendant is a public official. Pursuant to U.S.S.G.

[3] Counts One through Four charged co-defendants Daniel Chieh, among others, with bank fraud conspiracy and money laundering conspiracy.

§ 2C1.1(b)(1), the parties stipulated that a two-level enhancement applied because the offense involved more than one bribe. Pursuant to U.S.S.G. § 2C1.1(b)(2) and 2B1.1(b)(1)(B), the parties stipulated that a two-level enhancement applied because the value of the payments obtained exceeded $6,500 and was less than $15,000. Pursuant to U.S.S.G. § 2C1.1(b)(3), the parties stipulated that a four-level enhancement applied because the offense involved a public official in a high-level decision-making and sensitive position. Pursuant to U.S.S.G. § 2C1.1(b)(4), the parties stipulated that a two-level enhancement applied because the defendant was a public official who facilitated entry into the United States for a person. Pursuant to U.S.S.G. § 4C1.1, the parties stipulated that a two-level decrease applied because the defendant satisfies all the criteria set forth in U.S.S.G. § 4C1.1(a). Assuming a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, the plea agreement stipulated that the total offense level was 19. Combined with a Criminal History Category of I, this resulted in a Guidelines range of 30 to 37 months' imprisonment, and an applicable fine range of $10,000 to $100,000.

The PSR also calculated that the defendant's total offense level was 19, and his Criminal History Category was I, resulting in a Guidelines range of 30 to 37 months' imprisonment, and an applicable fine range of $10,000 to $100,000. (PSR ¶¶ 95-113, 146, 153-54).

## IV. Discussion

### A. Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**B. A Guidelines Sentence is Necessary to Serve the Purposes of Sentencing**

A sentence within the Guidelines range of 30 to 37 months' imprisonment is necessary in this case to reflect the seriousness of the defendant's conduct, provide just punishment for the offense, achieve specific and general deterrence, protect the community from further crimes by the defendant, and promote respect for the law.

At the outset, a substantial term of imprisonment is necessary to reflect the seriousness and extraordinary scope of the defendant's criminal activity. Between 2016 and 2024, the defendant participated in a scheme where he disseminated confidential information from sensitive government databases, offered to make immigration arrests (and with respect to Victim-1, actually made an arrest), and provided border-related assistance to foreign nationals entering the United States—all in exchange for bribes and gratuities like cash payments, meals, and bottles of alcohol. In total, the defendant disclosed confidential information or otherwise improperly provided border-related assistance to at least 12 different co-conspirators, and he received at least $12,600 in bribe and gratuity payments in exchange for his official acts and breaches of duty.

The defendant's misconduct in this case is particularly serious because the defendant compromised the integrity and confidentiality of sensitive government databases, border security, and ICE's investigation and arrest operations. With respect to co-defendant Tommy Lin, the defendant arrested Victim-1 for Lin in 2021, sent law enforcement sensitive documents with Victim-1's personal identifying information to Lin, and provided Lin with photographs of Victim-1 sitting in an ICE detention cell—all so that Lin could himself brag to bank fraudsters like co-defendants Daniel Chieh and Naifeng Xu: "That's why they shouldn't bully Brother Tommy's friends." Victim-1 was targeted by Tommy Lin, Daniel Chieh, and other members of the bank fraud conspiracy because Victim-1 had threatened to report the scheme to law enforcement. (PSR ¶ 26). By arresting Victim-1 on behalf of Tommy Lin, the defendant emboldened the members of this criminal conspiracy, making them believe that they were invincible because they could corruptly pay law enforcement officers to do their bidding and silence their enemies. One of the members of the conspiracy said after the defendant arrested Victim-1: "I am a little bit emotional! It's like the real version of Project Gutenberg,[4] cops and criminals, same family!" Less than 15 minutes after the defendant sent to Tommy Lin a copy of the photograph of Victim-1 on October 28, 2020, Lin responded: "your watch is here for pick up. Great timing" | "you free later this evening or tomorrow to meet up" | "Limited Edition[Grin][Grin]".

Similarly, the defendant disclosed confidential information from law enforcement databases to Hiu Kit David Chong in or around January 2020 about an FBI investigation where Chong was the primary target of the investigation—essentially informing Chong that he was being investigated by the FBI, which gave Chong the opportunity to decide whether to destroy evidence or flee from law enforcement by staying in China. In April 2020, Chong eventually negotiated a guilty plea with the United States Attorney's Office for the Central District of California and

[4] Project Gutenberg is a 2018 crime thriller film originally released in Hong Kong.

pleaded guilty to participating in a scheme to defraud a prominent research university in Southern California. By tipping off Chong about the existence of this investigation and Chong's status as a target of the FBI, the defendant compromised the integrity of the FBI's investigation into Chong. Similarly, with respect to CC-1, the defendant lied to a CBP supervisor at JFK airport and falsely claimed that CC-1's family member was the defendant's own mother-in-law so that CC-1's family member could get expedited entry into the United States. The defendant's text messages show that he recognized the contraband and smuggling-related crimes that a person can commit when granted expedited entry into the United States ("You can bring all the fruits and meats u want!! Haha. No checking."). In a particularly concerning exchange, the defendant even offered to CC-1 to obstruct ICE immigration operations so that CC-1's associates could avoid being arrested and removed from the United States ("if you have any frds reporting to immigration from now on . . . I'll check it for you and tell u if they gonna take them into custody or not if they report."). These are just a few examples of the brazen and dangerous actions that the defendant took and offered to take for co-conspirators who were willing to pay him bribes and gratuities. The defendant's actions threatened to compromise law enforcement investigations and jeopardize border security by circumventing inspection protocols.

The defendant also improperly disclosed personal identifying information of various individuals, like names, addresses, alien numbers, dates of birth, and criminal histories—violating the rights of these individuals to have their sensitive personal data kept confidential. There are compelling privacy and public safety reasons why law enforcement and immigration databases are confidential and access-restricted, and the defendant jeopardized those interests by essentially selling that data to anyone willing to pay him a bribe or gratuity. For CC-2, for example, the defendant knowingly checked border crossing databases for CC-2's ex-girlfriend/ex-wife so that CC-2 could stay apprised of her international travel history—essentially allowing CC-2 to track his ex-girlfriend/ex-wife movements without her knowledge or consent. As the defendant himself conceded while being interviewed by the FBI in June 2024, each and every improper disclosure of personal identifying information from confidential government databases represented an "egregious violation" of the law. The defendant committed dozens of those violations by disclosing personal identifying information about at least 28 different individuals to his co-conspirators. The defendant's crimes cannot be described as a momentary lapse in judgment, or an aberration in an otherwise law-abiding life. The defendant participated in this scheme for years, ran dozens of improper database checks, sent thousands of text messages in furtherance of the scheme, told co-conspirators to delete evidence of his crimes, and conspired with over a dozen other individuals. The scope, the length of time, and the dangerousness and harm caused by the defendant's participation in this bribery and gratuities scheme all strongly weigh in favor of a serious sentence.

The defendant's individual history and characteristics also support a significant term of imprisonment and, contrary to the defendant's arguments, do not warrant a downward variance. There are several aspects to the defendant's criminal activities in this case that are particularly concerning with respect to how they bear on the defendant's individual characteristics:

*First*, the defendant's own words and actions demonstrate that he participated in this criminal conduct because of his own greed, ego, and desire for power, and not merely because of cultural norms of reciprocity or generosity towards friends and relatives, as the defendant suggests

in his sentencing submission. (Dkt. No. 156 at 11-13). It is not a coincidence that many of the most serious crimes committed by the defendant as part of this scheme were for individuals who held prominent positions, like Tommy Lin, who worked in the New York City Mayor's Office, or CC-1, who is a former candidate for City Council in New York City and the New York City State Assembly. Similarly, the defendant bragged about the power he had as an ICE officer and his access to DHS databases, bragging to Chong that he got to conduct immigration raids of "massage place[s]" and "check immigration status of the girls," offering to Chong that, "[i]f you give me name and date of birth, I can get photos and tell you if they are pretty or not pretty." In numerous text messages, the defendant and Seto also bragged about the bribes and gratuities that they were receiving from co-conspirators—demonstrating that one of their primary motivations for engaging in this illegal conduct was to get expensive items and other things of value from wealthy people:

- Defendant: "Your [sp] right a couple of bottles of liquor ain't worth it." | "He better give us something."
- Seto: "henry got me corrupted with [names of co-conspirators] . . . But [co-conspirator] dinners are entertaining." Defendant: "Yes and he gives stuff to us. Treats us good."
- Defendant to Seto: "I pass the torch on to you" | "Maybe he will start giving you expensive liquors that you can sell in the future"
- Defendant: "Only help [name of co-conspirator]. He's the only one not cheap with gifts."
- Defendant: "[Co-conspirator] better give you something nice" | "He's generous" | "Love [co-conspirator]"
- Defendant: "That fucking thing we did for [co-conspirator] and his family. Still didn't get nothing for that."
- After Seto bragged to the defendant that he had run "out of IA forms," the defendant responded that Seto must have "made a lot with your other Ias. $$$" | "[Co-conspirator]!" | "Louis 13 bottle [bottle of expensive cognac retailing for over $3,000]" | "Wow I'm so proud of you" | "I was never even close to your greatness"

These statements put the lie to the defendant's argument that he "*never* acted with malice or greed." (Dkt. No. 156 at 11) (emphasis added).

Additionally, while the defendant was participating in this bribery and gratuities scheme, the defendant was also simultaneously engaged in a series of frauds against the SBA, New York State's Emergency Rental Assistance Program, and the Federal Employee Education and Assistance Fund. These frauds primarily involved false claims of loss of rental income, which the defendant falsely reported on his 2021 tax returns and included again in applications for disaster relief funding. (PSR ¶¶ 75-76). The defendant also defrauded the New York State Medicaid Program by exaggerating the number of hours that the defendant spent providing home care to his elderly parents. (PSR ¶ 77). Together, the defendant defrauded these government programs of at least $175,000 to which he was not entitled. After receiving his fraudulently-obtained $1000 check from the Federal Employee Education and Assistance Fund—a non-profit organization designed to assist federal employees with education and emergency funding—the defendant sent a photograph of the check to Seto, who stated: "I love free $$." The defendant responded: "Good things happen to bad ppl." It is not possible to explain away the defendant's fraud against these government agencies as being motivated by reciprocity, generosity to friends and relatives, or social harmony. Rather, the defendant's own actions and words demonstrate that he was

repeatedly willing to lie, cheat, and steal money when it served his own interests—essentially placing his own desires for money, status, and power above his duties as a law enforcement officer and a law-abiding citizen. The defendant's attempts to rationalize his criminal conduct as purely stemming from loyalty, generosity, and respect conflict with the evidence in this case. The Court should reject the defendant's attempts to minimize the seriousness of this offense by suggesting that he committed this crime merely out of a desire to reciprocate to his friends and family, or that he was "manipulated" or "groomed" by a "den of thieves." (Dkt. No. 156 at 14).

*Second*, the defendant is not like the many criminals who appear before this Court for sentencing who engaged in criminal activities because of financial desperation or because they were raised in a family that was marked by violence and abuse. The defendant graduated from college, studied criminal justice, and began his career with ICE in June 2007. (PSR ¶¶ 133, 134, 139). In September 2021, the defendant was promoted to Supervisory Detention and Deportation Officer, and he received various awards and recognitions as an ICE law enforcement officer. Financially speaking, the defendant was also extremely well-off, with a multi-million dollar net worth and an average annual income of well over $200,000 based on his salary and supplemental rental income. (PSR ¶ 143). Based on the defendant's background and upbringing, he had every opportunity to live a law-abiding and productive life. The defendant, however, chose to squander that opportunity by corrupting himself with bribes, gratuities, and fraud. One of the most concerning aspects about this case is how little it took for the defendant to repeatedly agree to compromise his solemn oath as a law enforcement officer in favor of the things of value and perceived goodwill he received from his co-conspirators. A serious sentence is necessary for specific deterrence. If the defendant repeatedly chose to engage in serious crimes in exchange for expensive alcohol, luxury meals, and cash payments from wealthy foreign nationals, the Government is extremely concerned about what other crimes the defendant may commit when tempted in the future, unless the Court imposes a sentence here that adequately deters the defendant from committing crimes again.

*Third*, the defendant has represented in his sentencing submission that he is a low risk of recidivism and is unlikely to commit any crimes again in the future based on the emotional and psychological work he has done to learn from his past mistakes. (Dkt. No. 156 at 14). Yet, the defendant has attempted to minimize his involvement in these crimes by suggesting that he was primarily motivated by loyalty and interpersonal harmony, instead of admitting that he was also being driven by greed and pride. The one-sided picture that is painted by the defendant's sentencing submission, which primarily emphasizes his volunteer work and care for his family, does not meaningfully grapple with all of the crimes that the defendant committed between 2016 and 2024. (Dkt. No. 156 at 4-6).

The defendant's own actions after he was interviewed by the FBI and became aware that co-conspirator Tommy Lin had been arrested are revealing. To begin with, the defendant lied to FBI agents during his interview in June 2024 and denied being involved in these criminal activities or ever providing any confidential information to Lin. (PSR ¶ 52). Next, the defendant immediately took steps to initiate his retirement from ICE, filing a disability claim that he was no longer able to carry out his law enforcement duties because of his hearing loss—a claim that would allow him to continue earning a sizable pension after his disability-related departure from ICE compared to being terminated for cause. (Dkt. No. 156 at 4). The timing of these events is

concerning for multiple reasons. To begin with, in the months leading up to his disability claim between January 2024 and May 2024, the defendant filed at least three different applications for other law enforcement positions as either a Supervisory Detention and Deportation Officer or Detention and Deportation Officer, strongly suggesting that his supposed hearing loss was not preventing him from carrying out his duties and the defendant had every intention to continue working until his interview with the FBI. Additionally, in a conversation with co-defendant Kevin Seto in August 2024, the defendant did not say anything about disability or hearing loss as the reason for initiating his retirement. Rather, the defendant and Seto had the following exchange on August 31, 2024:

| | |
|---|---|
| **Defendant:** | I'm fucked |
| **Seto:** | How do \| So \| You leaving |
| **Defendant:** | I loved my job |
| **Seto:** | I know you did \| And I would've switched over to join you |
| **Defendant:** | I'm forced to retire |
| **Seto:** | Yes because of our own actions |
| **Defendant:** | Umm not really. \| I didn't steal banks money |
| **Seto:** | You didn't but you fell victim to a part of their tactics |
| **Defendant:** | Yea unconsciously fell victim to it |
| **Seto:** | You were used like a tool and unfortunately when the house of cards fall, everyone that was linked to it also falls |

These text messages are extremely revealing as to the defendant's own lack of remorse or acceptance of responsibility following his interview with the FBI in June 2024. In these messages, the defendant denied his own criminal culpability ("I didn't steal banks money" | "Yea unconsciously fell victim to it") and even claimed that he was acting "unconsciously" and "fell victim to it." The defendant also made clear that he was being forced to retire because of the FBI's investigation into his conduct, not because of any disability. The FBI has not identified any text messages between January 2024 and the date of the FBI's interview of Yau in June 2024 corroborating the defendant's complaints that his tinnitus or hearing loss was preventing him from carrying out his law enforcement duties. Quite to the contrary, in text messages exchanged between the defendant and Seto on November 12, 2024—following the defendant's retirement—the defendant again blamed the FBI's investigation for forcing him to retirement. In response to Seto sending a link to a news article about likely increased ICE enforcement activity in 2025, the defendant responded: "I always have the bad luck. That's my problem . . . Man OT [overtime] money to be made . . . That guy [referring to Tommy Lin] ruined my life." While the Government does not dispute that the defendant has been diagnosed with tinnitus and hearing loss by multiple healthcare professionals, the Government notes that the defendant's decision to file his disability claim came immediately after learning of the FBI's investigation into his conduct, and he admitted to Seto that he was "forced to retire" because of the pending investigation into his misconduct. Prior to his departure from ICE, the defendant also engaged in a final act of lawbreaking on November 1, 2024 and November 2, 2024 by exfiltrating thousands of government documents onto a removable thumb drive, including documents marked as law enforcement sensitive; documents containing personally identifiable information; guides; forms; and passwords to government and private platforms. (PSR ¶ 74). At each step, when the defendant was presented with a chance to bend the rules, lie, or act opportunistically for his own self-interest, he did so.

This continuous pattern of selfish law-breaking behavior should give the Court significant pause about the defendant's claims that he will never engage in criminal activities again in the future.

Finally, the need for the Court's sentence to provide general deterrence to other law enforcement officers, to other ICE/CBP officers, and to generally promote respect for the law is important. There is no question that this case has garnered significant attention within the community of ICE/CBP officers in New York City and across the country. The Court's sentence must send a message that public corruption within the ranks of federal law enforcement will not be tolerated. As this Court has previously pointed out, the "corruption of a public agency" is "at the top of the list" and "worst of the worst" of crimes that come before this Court for sentencing. *United States v. Gibbs*, 22 Cr. 534 (CM) (Sentencing Transcript, ECF No. 30 at 14); *see also United States v. Rupnarain*, 24 Cr. 125 (VEC) (Sentencing Transcript, ECF No. 28 at 25) (calling public corruption "one of the most serious of all federal offenses" because "[t]his country cannot exist if the public does not trust that public officials are operating as servants of the people and not corruptly for their own personal gain"); *United States v. Figueroa*, 22 Cr. 605 (Sentencing Transcript, ECF No. 27 at 17) (explaining that "corruption is a corrosive, destructive issue" and "[p]eople need to have faith in their government"). Law enforcement officers are entrusted with expansive powers—including the power to cabin the liberty of members of the public. When that trust is broken, it affects the public's view of all law enforcement officers—and not just bad actors like the defendant. To help rebuild that trust, and to send a message to all ICE law enforcement officers that corruption will not be tolerated, it is imperative that the Court send a message that ICE officers are not above the law, and ICE officers who allow themselves to be corrupted by bribes and gratuities will be punished severely. A sentence within the Guidelines range is also necessary to remind federal law enforcement officers of what they should already know—accepting bribes and gratuities is one of the worst decisions that they can make, not only because it is wrong but also because it will result in significant consequences.

For these reasons, the Government respectfully submits that a sentence within the Guidelines range of 30 to 37 months' imprisonment is necessary here.

**C. The Court Should Impose a Fine within the Guidelines Range**

The Government also respectfully requests that the Court impose a fine within the Guidelines range of $10,000 to $100,000. USSG § 5E1.2(a) "requires a district court to impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.'" *United States v. Glick*, 142 F.3d 520, 528 (2d Cir. 1998) (citation omitted). In assessing an appropriate fine, the sentencing court must consider certain factors, such as the defendant's income, earning capacity, and financial resources. *Id.* These factors are relevant "only to the amount of the fine, rather than the decision whether to impose a fine." *United States v. Corace*, 146 F.3d 51, 56 (2d Cir. 1998). A court that imposes a fine may do so "only to the extent that such fine will not impair the ability of the defendant to make restitution." *Id.* (cleaned up). Applying these factors to the defendant, a fine within the Guidelines range here is both reasonable and appropriate. Based on the defendant's multi-million dollar net worth and steady income from his ICE pension and numerous rental properties, it is clear that he is not indigent. Additionally, the evidence here shows that the defendant was largely motivated by greed and a desire for more money. The imposition of a significant financial penalty beyond restitution and

forfeiture here is supported by all the 18 U.S.C. § 3553(a) factors, including the need to promote respect for the law and to deter the defendant from engaging in crimes in the future that are motivated by a desire for dishonest financial gain.

## IV. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Guidelines range of 30 to 37 months' imprisonment and a fine within the Guidelines range of $10,000 to $100,000, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: /s/
Andrew K. Chan
James Ligtenberg
Ni Qian
Assistant United States Attorneys
(212) 637-1072 / 2665 / 2364

cc: Raymond Granger, Esq.